IN THE MATTER OF THE GUARDIANSHIP OF
D., C., E. AND A., JUVENILES.

Juvenile and Domestic Relations Court
Camden County

May 10, 1979.

*Mr. Harry Shaw* for defendants.

*Ms. Mary O'Connell,* Deputy Attorney General for Division of Youth and Family Services, Department of Institutions and Agencies (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney).

PAGE, P. J. J. D. R. C. The New Jersey Division of Youth and Family Services (DYFS) seeks the termination of parental rights of the biological Spanish-speaking, parents M. and F., and guardianship of four children, D. age 10, C. age 9, E. age 7 and A. age 5, pursuant to *N. J. S. A.* 30:4C–15 and 30:4C–20.

The four children were voluntarily placed in foster care on September 25, 1974 and have remained in their respective foster homes since that time. Little information is available regarding early family history.

In 1970 M., the mother, was hospitalized in Ancora Psychiatric Hospital for approximately six weeks due to a "nervous breakdown." The diagnosis was "acute schizophrenic episode."

On November 30, 1973 the parents were visited by a nurse from the Visiting Nurse and Health Association of Camden County. The nurse observed that the mother did not respond appropriately to questions and was in need of psychiatric help, which she would not accept from the agency.

On January 30, 1974 the mother allegedly signed a DYFS application requesting social services for the four children. In March of 1974 a DYFS caseworker visited the parents. She noted that A., who was then six months old, had not received any post-natal care. He also needed medical treatment for a heart murmur. D., six years old, had not been enrolled in school. C., five years old, had not learned to communicate verbally.

In the spring of 1974 the home conditions were very poor. Although F., the father, was employed, the family was experiencing great financial difficulties. There was no food,

heat or electricity in the home. The children were scantily clothed. M., the mother, told the caseworker that F. was gambling and drinking with the money. The emphasis of DYFS intervention during this period was on improving the family situation. Despite the family's receiving additional welfare monies, no change in circumstances resulted. F. assured the caseworker that the bills were being paid; however, this was not true. M. interacted very little with the children and spent most of her time sitting or standing in a corner. All efforts to improve the living conditions in the home and the family's financial situation failed.

On September 24, 1974 F. signed a voluntary care agreement which granted DYFS care and custody over D., C., E. and A. The following day the children were placed in foster care with non-Spanish speaking families. Regular supervised visits between the children and their natural parents occurred until March 1975.

On December 14, 1974 M. was admitted to Our Lady of Lourdes Hospital mental health ward. Prior to her admission she had been withdrawn, uncommunicative and had no interest in performing household chores or caring for the children.

In March 1975 the parents, M. and F., returned to their native Puerto Rico. DYFS was not able to reach the family at the addresses M. gave the caseworker prior to their departure. Unsuccessful attempts were made during 1975 to find the parents through the Department of Social Services in Puerto Rico.

In July 1976 the DYFS caseworker received a letter from Social Services which indicated that the parents had been located and a home investigation had been made. It revealed that M. cooked and did housework whenever possible, but "mostly she sits in a chair for hours." As a result, F. assumed primary responsibility for the home and care of their baby girl who was born in August 1975. M. was not receiving any after-care treatment at the mental health center since she "insists she does not need it." F. stated he was

unable to find work and he was receiving unemployment compensation. However, the social service worker believed his inability to hold a job was due to his heavy drinking. F. and M. stated they wanted their children back but did not feel they had an adequate home for them. M. stated that "they are better off where they are." The Department of Social Services' recommendation was that the children's return to Puerto Rico should be postponed until conditions improve.

F. responded to a DYFS letter sent to him in August 1976 and advised the agency that his caseworker had told him to get in touch with DYFS after he had obtained housing for his family.

On March 8, 1977 the DYFS office received another letter from the Department of Social Services in Puerto Rico stating that M.'s mental condition remained unchanged. F. had secured employment but he left his job due to his wife's inability to care for their home or for their daughter who was sickly. The parents realized they were incapable of caring for their children under present circumstances, but they were attempting to contact family members who might be suitable caretakers for the children. The Department was planning to evaluate the homes of their relatives to ascertain whether or not placement with them would be appropriate.

On June 2, 1977, while he was in New Jersey employed as a seasonal farmworker, F. came to the DYFS office in Camden to discuss the agency's plans for his children. The worker explained that the children had been in English-speaking homes for almost three years and their foster parents anticipated adopting them. F. opposed the idea of adoption but he made no effort to see his children while he was in the United States.

A few weeks later the DYFS office received a letter from Social Services in Puerto Rico which indicated they had investigated the homes of the relatives and deemed them to be unsuitable for placement of the children.

In July 1977 the worker received a letter from F. which indicated he was leaving the United States and returning

to Puerto Rico because "they want to put my wife in the hospital and I have to care for my daughter." During July 1977 the cases of C and A. were transferred to the adoption unit.

There was no further contact with the parents or the Department of Social Services in Puerto Rico until May 1978, when DYFS received a final correspondence from Social Services informing them that the parents had relocated to Brooklyn, N. Y. M's diagnosis at the time of their departure was chronic schizophrenia, moderately severe. This condition, according to Social Services, prevented her from performing any type of work. She had stopped her treatment. F. was unemployed; the family received welfare and food stamps. F. assumed the responsibility of caring for his daughter. His parents, who lived across the street, prepared and sent their meals. M. apparently did no chores except the laundry.

Visits were scheduled between the parents and their children pursuant to the parents' request. The first visit took place on June 5, 1978 between the parents and D. and E. The younger children were not included because they were not familiar with their parents. There was little interaction between the parents and the children. D. and E. withdrew when their mother tried to greet them. Shortly after the first visit the parents relocated to the Camden area.

Another visit was scheduled for June 13, 1978. M.'s son A., who is bilingual, was present. D., E. and C. played with each other. The youngest child in placement, A., was not present since a psychiatric evaluation indicated that visitation would be detrimental to the child. Again, there was little interaction between parents and children.

The next visit was scheduled for July 25, 1978 and then cancelled and rescheduled for July 27. However, F. showed up alone on the 25th and neither parent appeared on the 27th, although the three older children were waiting.

D. and E. visited with their parents in early August. Later that week C. visited with his father alone. There was limited conversation between the two of them.

The final visit in September 1978 was similar to the earlier visits. The children played among themselves while F. attempted to converse with the children. M. did not interact with her children at all. She merely sat and stared at them.

In August 1978 the supervision of D. and E. was transferred to the adoption unit. Shortly thereafter, this petition for guardianship was filed.

The standard to be used in actions for termination of parental rights is the "best interests of the child." All rights and interests are subservient. "Even parental rights must yield to this principle." *In re Mrs. M., 74 N. J. Super.* 178 (App. Div. 1962). The burden of proof is on DYFS to establish grounds for termination by clear and convincing evidence. *In re Guardianship of BCH, 108 N. J. Super.* 531, 537 (App. Div. 1970).

The "best interests" standard has been defined generally as the "safety, happiness, physical, mental and moral welfare of the child." *Fantony v. Fantony, 21 N. J.* 525, 536 (1956). The interpretation of the "best interests" standard under *N. J. S. A.* 30:4C–15 was established in *In re Cope, 106 N. J. Super.* 336 (App. Div. 1969) where the Appellate Division stated:

It is, therefore, incumbent upon the Bureau, or other petitioner for guardianship to show more than that it will provide a better home for the child. It must demonstrate affirmatively that the child's best interests will be substantially prejudiced if he is permitted to remain with his parent — *e. g.,* that his health and development have been or probably will be impaired and that the parent is unlikely or unwilling to change, or that the parent is in some way incapable of caring for the child or unwilling to do so. [at 340, 341]

The first factor enumerated by the *Cope* court concerns the impairment of health and development. It is noteworthy that recent case law emphasizes the mental health of the child.

In *In re Guardianship of R., F., G., 155 N. J. Super.* 186, 194 (App. Div. 1978), the Appellate Division demonstrated its specific concern with the potential of psychological im-

pairment to the child by stating: "There is no doubt that the mental health of the child and its best interest psychologically must always be considered." That court reiterated its concern for the mental health of the child by saying that parental rights should be severed if "the trier of the facts is convinced that the child's best interests will be substantially prejudiced by way of impairment [of] his mental or psychological health if he is permitted to remain with his parents or if his custody is to be returned to the natural parents within the near future." *J & E v. M & F.*, 157 *N. J. Super.* 478, 489–490 (App. Div. 1978).

The recognition of the importance of the concept of "psychological parenthood" is in keeping with the emphasis on the mental health of the child in applying the "best interest" in custody determinations. In *Sees v. Baber,* 74 *N. J.* 201 (1977), the Supreme Court stated:

It has been recognized that the psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood. [at 222]

The Supreme Court cited the potentiality for serious psychological harm in uprooting a child from an adoptive home and transferring custody to the natural parents in view of the substantive period of time that the child had been in the only real home she ever knew. *Sorentino v. Family & Children's Society of Elizabeth (Sorentino I),* 72 *N. J.* 127, 133 (1976).

In *Beyond the Best Interests of the Child,* by Goldstein, Freud and Solnit (1973), the view is expressed:

* * * for the child, the physical realities of his conception and birth are not the direct cause of his emotional attachment. This attachment results from day-to-day attention to his need for physical care, nourishment, comfort, affection and stimulation. Only a parent who provides for these needs will build a psychological relationship to the child on the basis of the biological one and will become his "psychological parent" in whose care the child can feel valued and wanted. [at 17]

Dr. Francisco Torres evaluated the four children pursuant to a request by the court. His qualifications as an expert are undisputed. His evaluations were thorough and his opinions reasonable and uncontradicted.

With reference to A., who was four at the time of the interview, Dr. Torres stated unequivocally that it would be in his best interests to remain with his present foster parents. He did not recommend visitation with the natural parents prior to the resolution of the present action since there has been no previous contact between A. and the natural parents after he left their home at the age of 13 months. According to Dr. Torres, A. was "growing up emotionally stable and was identifying himself as a member of the [foster] family."

Dr. Torres noted that C., age nine, was a shy, nervous youngster. In his opinion "[C.] felt threatened by visits to his natural parents and feared separation from the loved objects, who in the case appeared to be the M.s [foster parents], the psychological parents." After visits with his natural parents, C. follows Mrs. M. [his foster parent] around and asks for reassurance that she is coming back whenever she leaves. The doctor concluded by saying:

There's no doubt that if this child [C.] is removed from the Ms, it will cause him considerable emotional difficulties that will probably require long years of therapy.

The other two children, D., age ten, and E., age six, reside in the same foster home but were evaluated separately by Dr. Torres. As to D. Dr. Torres stated:

* * * [D.] views the Gs [her foster parents] as her psychological parents * * * moving her away would be a traumatic experience that * * * will be very damaging.

E. identified very strongly with the Gs as his psychological parents. Dr. Torres stated,

I do not know how [E.] would handle separation from them, nobody can say, but it cannot be healthy in any way. It can crush his capacity for trusting to say the least, and trusting is a basic

ingredient that one should have in order to go on in life relating successfully with other human beings.

In his overall evaluation of the children Dr. Torres concluded that returning the children to their natural parents, would, in view of cultural and language difficulties result ing from placement of the children in non-Hispanic homes, aggravate the situation. In his opinion, "It represents added stress to be overcome."

The court spoke to each of the children individually, in chambers. The two younger children, A. and E., had no memory of their natural parents. C. vaguely remembered living in a home in Camden. E. remembered her natural parents but was not desirous of returning to live with them. All of the children related completely to their respective foster families, and all expressed a definite preference for remaining with them.

█ This court finds that the respective foster parents of the children are clearly their psychological parents. It is the opinion of this court that the children's mental health would be impaired by returning them to their natural parents.

The second factor mentioned by the court in *In re Cope, supra*, was an unwillingness or the unlikelihood of the parents to change. Both F. and M. were examined by Dr. Pedro Garcia. The interviews were conducted in Spanish. In Dr. Garcia's opinion there was "no contra indication of [F.] having custody of the children." However, he withheld making a final determination pending examination of M.

M. failed to keep her initial psychiatric appointment. Five weeks after F. had been evaluated, M. was persuaded to see Dr. Garcia. Dr. Garcia noted that she was very resentful toward authorities. He stated that she denied there was "anything wrong with her mentally." During the interview she appeared

". . . vague, evasive and guarded. Withdrawn. Eye contact was poor. No rapport. Speech lacked spontaneity and at times was irrelevant. Affect was flat and depressed. Used massive denial. Un-

kept and disheveled in appearance. Although patient denies hallucinations there seems to be some difficulty in thinking process and perception. . . . Memory was poor for past events. Insight is lacking and judgment fair to poor."

Dr. Garcia concluded M. was suffering from a chronic thought disorder. In.addition he stated, "She has no insight into this problem and is not receptive to psychiatric treatment and follow-up which makes her situation more complicated and serious."

Based on the available information it was Dr. Garcia's recommendation that the children be kept outside the home environment of the natural parents.

There has been a continuing failure on M.'s part to acknowledge any mental health problem. In addition, she initially refused to attend the court-ordered psychiatric evaluation. During the course of the hearing the court impressed upon her the importance of her being evaluated. After about a month she agreed to see the psychiatrist.

It is noteworthy that M. failed to appear at the final hearing on this matter. According to the representation made by counsel, she refused to attend. Therefore, her failure to acknowledge and deal with her mental disability and her refusal to appear at the court hearing can only be interpreted as an unwillingness or unlikelihood to change. The psychiatric reports did not oppose F.'s having custody of the children. However, his parental rights cannot be considered apart from those of his wife.

The Appellate Division addressed this issue directly by stating:

The concern must be for the best interest of the children in the context of the environment to which they would be returned, their parents' home and not the possessory rights of a single parent, who might be less afflicted than [the] spouse. [*In re Guardianship of R., F., and G.*, 155 *N. J. Super.* 186, 195 (App. Div. 1978)]

The natural parents' lack of contact with the children since the placement of the children in 1974 is significant.

There is no evidence of phone calls, letters or other correspondence with the children between March 1975 and May 1978. F. visited the DYFS office in June 1977 but did not request to see his children. On two other occasions prior to his moving to New York in May 1978 he was in the area but made no effort to see the children.

The lack of contact with the children over the four-year period and the failure to formulate plans for their return can only be interpreted as a lack of concern on the part of the parents. The court finds that they are unlikely or incapable of changing behavior patterns which were detrimental to the children prior to their placement in 1974.

DYFS placed the children with non-Hispanic families, resulting in their inability to speak or communicate in Spanish. Since the natural parents have limited ability to communicate in English, this fact is important in determining the best interests of the children. The need for children to communicate and express themselves freely with their parents is the very core of any family relationship.

At present, the children are no longer able to speak Spanish. Readjustment to living with their natural parents would be extremely difficult, even under the best circumstances.

At this time it is difficult to foresee these children returning home and overcoming the affects of the psychological ties with their foster parents when they cannot even talk to their natural parents. In addition to the problem of communication, there are also the cultural differences between their white Anglo-Saxon foster homes and their low-income Hispanic parents.

A case like this is tragic, where the state agency has, in effect, from the beginning programmed that these children could never be returned to their natural parents by depriving them of their Spanish heritage.

Our court system is powerless to correct such a manifest abuse of the basic principles of social psychology. It is too late now to insist that the children be placed in Spanish

homes. The only issue before this court is their best interests, regardless of how the situation arose. *Sorentino v. Family & Children's Society of Elizabeth*, 72 *N. J.* 127, 133 (1976) (*Sorentino* I), 74 *N. J.* 313 (1977) (*Sorentino* II).

DYFS stands in a unique position of being unfettered by the basic concepts of due process. If they were a law enforcement agency involved in a criminal case, the courts could remedy the blatant abuse by suppressing the evidence or filing criminal charges against the improper actions of the officers. *Wolf v. Colorado*, 338 *U. S.* 25, 69 *S. Ct.* 1359, 93 *L. Ed.* 1782 (1949).

However, in the very important field of children and family rights there are no such controls or restraints to prevent further agency abuses. Because of their immunity from suit, the natural parents here, and others similarly situated, probably do not even have civil remedies against the social workers who placed their Hispanic children in a totally inappropriate cultural environment. *N. J. S. A.* 59:3-2. It is hoped that in the future such children will be protected by the provisions of the Child Placement Review Act, *N. J. S. A.* 30:4C–50 *et seq.*

The court finds that DYFS has proved by clear and convincing evidence that return of the children to their natural parents would be substantially prejudicial to the "best interests" of D., C., E. and A.

The parental rights of the natural parents will be terminated and severed permanently as to their children C., D., E. and A. These children shall become the legal wards of the Division of Youth and Family Services for all purposes, "including * * * placement * * * for adoption." *N. J. S. A.* 30:4C–20.