748 A.2d 539 (2000)
163 N.J. 200
V.C., Plaintiff-Respondent and Cross-Appellant,
v.
M.J.B., Defendant-Appellant and Cross-Respondent.
Supreme Court of New Jersey.
Argued October 25, 1999.
Decided April 6, 2000.
*541 Alfred J. Luciani, for defendant-appellant and cross-respondent.
Robin T. Wernik, Matawan, for plaintiff-respondent and cross-appellant (Granata, Wernik & Zaccardi, attorneys).
Leslie Cooper, a member of the New York bar, New York City, for amici curiae American Civil Liberties Union of New Jersey, American Civil Liberties Union Foundation, Lambda Legal Defense and Education Fund, National Center for Lesbian Rights and Lambda Families of New Jersey (Wilentz, Goldman & Spitzer, Eatontown, attorneys; Ms. Leslie, David M. Wildstein, David R. Rocah and Lenora M. Lapidus, on the brief).
Gregory J. Sullivan, Hamilton, submitted a brief on behalf of amicus curiae Concerned Women for America (Hartsough, Kenny & Chase, attorneys).
*540 The opinion of the court was delivered by LONG, J.
In this case, we are called on to determine what legal standard applies to a third party's claim to joint custody and visitation of her former domestic partner's biological children, with whom she lived in a familial *542 setting and in respect of whom she claims to have functioned as a psychological parent. Although the case arises in the context of a lesbian couple, the standard we enunciate is applicable to all persons who have willingly, and with the approval of the legal parent, undertaken the duties of a parent to a child not related by blood or adoption.[1]

I
The following facts were established at trial. V.C. and M.J.B., who are lesbians, met in 1992 and began dating on July 4, 1993. On July 9, 1993, M.J.B. went to see a fertility specialist to begin artificial insemination procedures. She prepared for that appointment by recording her body temperature for eight to nine months prior for purposes of tracking her ovulation schedule. She had been planning to be artificially inseminated since late 1980. According to M.J.B., she made the final decision to become pregnant independently and before beginning her relationship with V.C. Two individuals who knew M.J.B. before she began dating V.C., confirmed that M.J.B. had been planning to become pregnant through artificial insemination for years prior to the beginning of the parties' relationship.
According to V.C., early in their relationship, the two discussed having children. However, V.C. did not become aware of M.J.B.'s visits with the specialist and her decision to have a baby by artificial insemination until September 1993. In fact, the doctor's records of M.J.B.'s first appointment indicate that M.J.B. was single and that she "desires children."
Nonetheless, V.C. claimed that the parties jointly decided to have children and that she and M.J.B. jointly researched and decided which sperm donor they should use. M.J.B. acknowledged that she consulted V.C. on the issue but maintained that she individually made the final choice about which sperm donor to use.
Between November 1993 and February 1994, M.J.B. underwent several insemination procedures. V.C. attended at least two of those sessions. In December 1993, V.C. moved into M.J.B.'s apartment. Two months later, on February 7, 1994, the doctor informed M.J.B. that she was pregnant. M.J.B. called V.C. at work to tell her the good news. Eventually, M.J.B. was informed that she was having twins.
During M.J.B.'s pregnancy, both M.J.B. and V.C. prepared for the birth of the twins by attending pre-natal and Lamaze classes. In April 1994, the parties moved to a larger apartment to accommodate the pending births. V.C. contended that during that time they jointly decided on the children's names. M.J.B. admitted consulting V.C., but maintained that she made the final decision regarding names.
The children were born on September 29, 1994. V.C. took M.J.B. to the hospital and she was present in the delivery room at the birth of the children. At the hospital, the nurses and staff treated V.C. as if she were a mother. Immediately following the birth, the nurses gave one child to M.J.B. to hold and the other to V.C., and took pictures of the four of them together. After the children were born, M.J.B. took a three-month maternity leave and V.C. took a three-week vacation.
The parties opened joint bank accounts for their household expenses, and prepared wills, powers of attorney, and named each other as the beneficiary for their respective life insurance policies. At some point, the parties also opened savings accounts for the children, and named V.C. as custodian for one account and M.J.B. as custodian for the other.
The parties also decided to have the children call M.J.B. "Mommy" and V.C. "Meema." M.J.B. conceded that she referred *543 to V.C. as a "mother" of the children. In addition, M.J.B. supported the notion, both publicly and privately, that during the twenty-three months after the children were born, the parties and the children functioned as a family unit. M.J.B. sent cards and letters to V.C. that referred to V.C. as the children's mother, and indicated that the four of them were a family. The children also gave cards to V.C. that indicated that V.C. was their mother. M.J.B. encouraged a relationship between V.C. and the children and sought to create a "happy, cohesive environment for the children." M.J.B. admitted that, when the parties' relationship was intact, she sometimes thought of the four of them as a family. However, although M.J.B. sometimes considered the children "theirs," other times she considered them "hers".
M.J.B. agreed that both parties cared for the children but insisted that she made substantive decisions regarding their lives. For instance, M.J.B. maintained that she independently researched and made the final decisions regarding the children's pediatrician and day care center. V.C. countered that she was equally involved in all decision-making regarding the children. Specifically, V.C. claimed that she participated in choosing a day care center for the children, and it is clear that M.J.B. brought V.C. to visit the center she selected prior to making a final decision.
M.J.B. acknowledged that V.C. assumed substantial responsibility for the children, but maintained that V.C. was a mere helper and not a co-parent. However, according to V.C., she acted as a co-parent to the children and had equal parenting responsibility. Indeed, M.J.B. listed V.C. as the "other mother" on the children's pediatrician and day care registration forms. M.J.B. also gave V.C. medical power of attorney over the children.
A number of witnesses testified about their observations of the parties' relationship and V.C.'s role in the children's lives. V.C.'s mother testified that M.J.B. told her that V.C. and M.J.B. would be co-parents to the children and that the parties made a joint decision to have children. In addition, she observed that M.J.B., V.C. and the children functioned as a family. Likewise, L.M., a co-worker and friend of M.J.B., testified that she spent time with the parties before, during and after M.J.B.'s pregnancy, and that she regarded the parties as equal co-parents to the children.
Another co-worker and friend of M.J.B., D.B., also testified that V.C. was a co-parent to the children. In addition, D.B. revealed that M.J.B. planned to continue the relationship between V.C. and the children after the breakup, as long as V.C. contributed money toward the children's expenses. However, another witness, A.R., indicated that V.C. was minimally involved in taking care of the children, but acknowledged that V.C. had an important role in the twins' lives. Testifying for M.J.B., both A.R. and M.I. stated that they regarded M.J.B. as the children's primary caretaker.
Together the parties purchased a home in February 1995. Later that year, V.C. asked M.J.B. to marry her, and M.J.B. accepted. In July 1995, the parties held a commitment ceremony where they were "married." At the ceremony, V.C., M.J.B. and the twins were blessed as a "family."
Together, V.C. and M.J.B. joined the Lambda family organization, made up of lesbian and gay parents or expectant parents. The Lambda family organization is a social group in which children become aware of other families that also have gay and lesbian parents. V.C. and M.J.B., together with the children, attended at least ten Lambda functions.
Additionally, as a group, V.C., M.J.B. and the twins attended family functions, holidays, and birthdays. According to V.C., she did not attend family functions with M.J.B.'s family because they were unhappy about M.J.B.'s sexual orientation. However, V.C. claimed that M.J.B. had a *544 very good relationship with V.C.'s mother, S.D., and that the children were very close to V.C.'s family. Apparently, the children referred to S.D. as "Grandma," and to V.C.'s grandmother, as "great-grandma."
During their relationship, the couple discussed both changing the twins' surname to a hyphenated form of the women's names and the possibility of V.C. adopting the children. M.J.B. testified that the parties considered adoption and in June 1996 consulted an attorney on the subject. M.J.B. paid a two thousand dollar retainer, and the attorney advised the parties to get letters from family and friends indicating that the parties and the twins functioned as a family. The parties never actually attempted to get the letters or proceed with the adoption. V.C. alleged that M.J.B. was willing to go through with the adoption even after the parties split.
Just two months later, in August 1996, M.J.B. ended the relationship. The parties then took turns living in the house with the children until November 1996. In December 1996, V.C., moved out. M.J.B. permitted V.C. to visit with the children until May 1997. During that time, V.C. spent approximately every other weekend with the children, and contributed money toward the household expenses.
In May 1997, M.J.B. went away on business and left the children with V.C. for two weeks. However, later that month, M.J.B. refused to continue V.C.'s visitation with the children, and at some point, M.J.B. stopped accepting V.C.'s money. M.J.B. asserted that she did not want to continue the children's contact with V.C. because she believed that V.C. was not properly caring for the children, and that the children were suffering distress from continued contact with V.C. Both parties became involved with new partners after the dissolution of their relationship. Eventually, V.C. filed this complaint for joint legal custody.[2]
At trial, expert witnesses appeared for both parties. Dr. Allwyn J. Levine testified on behalf of V.C., and Dr. David Brodzinsky testified on behalf of M.J.B. Both experts arrived at similar conclusions after having examined the women individually and with the children, and after examining the children separately.
Dr. Levine concluded that both children view V.C., as a maternal figure and that V.C. regards herself as one of the children's mothers. "[B]ecause the children were basically parented from birth" by V.C. and M.J.B. "until they physically separated," Dr. Levine concluded that the children view the parties "as inter-changeable maternal mothering objects" and "have established a maternal bond with both of the women."
Dr. Levine likened the parties' relationship to a heterosexual marriage. Consequently, the children would be affected by the loss of V.C. just as if they had been denied contact with their father after a divorce. Dr. Levine explained that the children would benefit from continued contact with V.C. because they had a bonded relationship with her. Dr. Levine further noted that if the children felt abandoned by V.C., they might also feel unnecessary guilt and assume that they made V.C. angry or somehow caused the parties' separation. Although the doctor believed that the children could adapt to the loss of V.C., he indicated that the long-term effects were unknown. Furthermore, Dr. Levine indicated that the animosity between V.C. and M.J.B. could harm the children, but surmised that counseling could lessen the parties' animosity.
Likewise, Dr. Brodzinsky concluded that V.C. and the children enjoyed a bonded relationship that benefitted both children. Dr. Brodzinsky determined that the children *545 regarded V.C. as a member of their family. The doctor believed that it was normal for young children to feel that way about a person with whom they have spent considerable time. However, Dr. Brodzinsky noted that as children "get older, family becomes more specifically tied ... to biological connections." The doctor's report indicated that, when asked who their mother was, the children did not immediately point to V.C., but upon further inquiry agreed that V.C. was their mother. The doctor further noted that the children viewed M.J.B's new partner as a current member of their family. Dr. Brodzinsky expressed concern that, if visitation were permitted, the parties' animosity would negatively impact the children. The doctor, however, acknowledged that counseling would reduce the level of animosity between the parties. Dr. Brodzinsky further recognized that the children would suffer some short-term stress from the loss of V.C. but would likely recover in time.
In contrast to Dr. Levine's opinion, Dr. Brodzinsky believed that the loss of V.C. was not akin to the loss of a parent in a heterosexual divorce. The doctor explained that societal views foster the expectation that a child and a parent will continue their relationship after a divorce, but that no similar expectation would exist for the children's relationship with V.C. Still, Dr. Brodzinsky testified that "[t]he ideal situation is that [M.J.B.] is allowed to get on with her life as she wants, but to the extent possible that ... these children be able at times to have some contact with [V.C.] who's important to them." Assuming that the parties could maintain a reasonably amicable relationship, Dr. Brodzinsky felt that the children "would probably benefit from ongoing contact [with V.C.] as they would with any person with whom they have a good solid relationship that can nurture them."
The trial court denied V.C.'s applications for joint legal custody and visitation because it concluded that she failed to establish that the bonded relationship she enjoyed with the children had risen to the level of psychological or de facto parenthood. In so doing, the court gave significant weight to the fact that the decision to have children was M.J.B.'s, and not a joint decision between M.J.B. and V.C.
Finding that V.C. did not qualify as a psychological parent to the children, the trial court opined that it would "only be able to consider [V.C.'s] petition for custody if [she] was able [to] prove [M.J.B.] to be an unfit parent." Because V.C. did not allege that M.J.B. was an unfit parent, the trial court held that V.C. lacked standing to petition for joint legal custody. The court also denied V.C.'s application for visitation, determining that even a step-parent would not be granted such visitation except for equitable reasons, not present here. Further, it resolved that visitation was not in the children's best interests because M.J.B. harbored animosity toward V.C. that would "inevitably pass[ ] along to the children." According to the trial court, the case might have been different had V.C. "enjoyed a longer and more irreplaceable relationship with the children...." Upon the entry of judgment, V.C. appealed.
On March 5, 1999, an Appellate Division panel decided the case in three separate opinions. 319 N.J.Super. 103, 725 A.2d 13. Judge Stern authored the majority opinion, which affirmed the denial of V.C.'s application for joint legal custody but reversed the denial of her petition for visitation. Id. at 106, 725 A.2d 13. In so doing, the court concluded that V.C. had established a parent-like relationship and "stood in the shoes of a parent." Id. at 119, 725 A.2d 13. The majority analyzed the case under the best interests of the child standard, and, based on the record before it, determined that joint legal custody was not in the best interests of the children. Id. at 119, 725 A.2d 13. The trial court's judgment denying V.C.'s petition for joint custody was affirmed. Id. at 119-20, 725 A.2d 13.
*546 As to visitation, although recognizing that animosity between the parties is an important factor in the best interests test, the majority concluded that M.J.B. cannot deprive V.C. or the twins of visitation simply because M.J.B. harbors negative feelings toward V.C. Id. at 118, 725 A.2d 13. Relying on the experts' testimony, the majority concluded that V.C.'s continued contact with the children is in their best interests; therefore, it reversed the judgment denying V.C.'s petition for visitation and remanded for proceedings to establish a visitation schedule. Id. at 119-20, 725 A.2d 13.
The two partial dissenters staked out opposite positions on the issues. Judge Braithwaite determined that V.C. does not qualify as a psychological parent and thus would have denied both joint custody and visitation. Judge Wecker concluded that V.C. qualifies as a psychological parent and that the best interests standard necessarily applies to both visitation and custody. Id. at 137, 725 A.2d 13. She would have granted visitation on the record before her and remanded for a best interests hearing on joint custody.
An order for visitation was established on March 26, 1999. Both M.J.B. and V.C. appealed as of right from the dissents discussed above. R. 2:2-1(a)(2). M.J.B. also moved for a stay. Thereafter, we denied M.J.B.'s stay motion and accelerated the appeals.

II
On appeal, M.J.B. argues that we lack subject matter jurisdiction to consider V.C.'s custody and visitation claims because the legislative scheme and the common law do not recognize her rights; that V.C. lacks standing to claim custody and visitation because she has not asserted parental unfitness; that V.C.'s application intrudes on M.J.B.'s basic liberty interest in raising her children as she sees fit; that protection of the children from serious harm is the only basis for governmental intervention into her private life with her children; that she has an absolute right to decide with whom her children will associate; that V.C. was the equivalent of a nanny whose status deserves no special acknowledgment; that she did not give consent to V.C.'s role as a "parent"; and finally that the Appellate Division erred in substituting its fact-finding for that of the trial court.
V.C. counters that she qualifies as a parent under N.J.S.A. 9:2-13(f); that she is a psychological parent[3] of the twins thus justifying the invocation of the court's parens patriae power to sustain that relationship; that in such circumstances the best interests test applies; and, on her cross-appeal, that denial of joint legal custody was erroneous because of her status as a de facto parent.
Various amici filed briefs supporting the arguments advanced by V.C. including the American Civil Liberties Union of New Jersey, the American Civil Liberties Union Foundation, the Lambda Legal Defense and Education Fund, the National Center for Lesbian Rights, and the Lambda Families of New Jersey. Those amici (collectively referred to as the "ACLU") are non-profit organizations that are committed, among other things, to defending the civil liberties and rights of gay and lesbian families and individuals. According to the ACLU, it submitted a brief "primarily because it is concerned about M.J.B.'s sweeping attack on the de facto parent doctrine, which has long served to protect children in this State by protecting their important relationships with adults who function as parents to them."
In addition, we granted Concerned Women For America ("CWA") the right to appear as amicus curiae in order to argue its case against a "heavy judicial hand *547 favoring the homosexual agenda." CWA asserts that the courts "are deliberately misconstruing the law to reach a politically correct result." According to CWA, the Legislature is the appropriate forum for this discussion.

III
We turn first to M.J.B.'s claim that we lack jurisdiction and that V.C. lacks standing to apply for joint custody and visitation because neither the statutes nor the common law acknowledge the existence of such a cause of action by a third party.

A
There are no statutes explicitly addressing whether a former unmarried domestic partner has standing to seek custody and visitation with her former partner's biological children. That is not to say, however, that the current statutory scheme dealing with issues of custody and visitation does not provide some guiding principles. N.J.S.A. 9:2-3 prescribes:
When the parents of a minor child live separately, or are about to do so, the Superior Court, in an action brought by either parent, shall have the same power to make judgments or orders concerning care, custody, education and maintenance as concerning a child whose parents are divorced....
Further, N.J.S.A. 9:2-4 provides, in part, that
[t]he Legislature finds and declares that it is in the publicpolicy of this State to assure minor children of frequent and continuing contact with both parents after the parents have separated or dissolved their marriage and that it is in the public interest to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy. In any proceeding involving the custody of a minor child, the rights of both parents shall be equal....
By that scheme, the Legislature has expressed the view that children should not generally be denied continuing contact with parents after the relationship between the parties ends.
N.J.S.A. 9:2-13(f) provides that "[t]he word "parent," when not otherwise described by the context, means a natural parent or parent by previous adoption." M.J.B. argues that because V.C. is not a natural or adoptive parent, we lack jurisdiction to consider her claims. That is an incomplete interpretation of the Act. Although the statutory definition of parent focuses on natural and adoptive parents, it also includes the phrase, "when not otherwise described by the context." That language evinces a legislative intent to leave open the possibility that individuals other than natural or adoptive parents may qualify as "parents," depending on the circumstances.[4]
*548 If a statute is clear and unambiguous on its face, the court must determine the intent of the Legislature from its plain meaning. Franklin Tower One, L.L.C. v. N.M., 157 N.J. 602, 613, 725 A.2d 1104 (1999) (citing Board of Educ. v. Neptune Township Educ. Ass'n, 144 N.J. 16, 25, 675 A.2d 611 (1996) (quoting State v. Butler, 89 N.J. 220, 226, 445 A.2d 399 (1982))). Moreover, statutory "language must not, if reasonably avoidable, be found to be inoperative, superfluous or meaningless." In re Sussex County Mun. Utils. Auth., 198 N.J.Super. 214, 217, 486 A.2d 932 (App.Div.1985) (quoting Hackensack Bd. of Educ. v. Hackensack, 63 N.J.Super. 560, 569, 165 A.2d 33 (App.Div.1960)).
By including the words "when not otherwise described by the context" in the statute, the Legislature obviously envisioned a case where the specific relationship between a child and a person not specifically denominated by the statute would qualify as "parental" under the scheme of Title 9. Although the Legislature may not have considered the precise case before us, it is hard to imagine what it could have had in mind in adding the "context" language other than a situation such as this, in which a person not related to a child by blood or adoption has stood in a parental role vis-a-vis the child. It is that contention by V.C. that brings this case before the court and affords us jurisdiction over V.C.'s complaint.[5]

B
Separate and apart from the statute, M.J.B. contends that there is no legal precedent for this action by V.C. She asserts, correctly, that a legal parent has a fundamental right to the care, custody and nurturance of his or her child. Watkins v. Nelson, 163 N.J. 235, 245, 748 A.2d 558 (2000); Matter of D.T., 200 N.J.Super. 171, 176, 491 A.2d 7 (App.Div. 1985). Various constitutional provisions have been cited as the source of that right, which is deeply imbedded in our collective consciousness and traditions. Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551, 559 (1972) (citing Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1112, 86 L.Ed. 1655, 1660 (1942) (equal protection clause)); Griswold v. Connecticut, 381 U.S. 479, 496, 85 S.Ct. 1678, 1688 14 L.Ed.2d 510, 522 (1965) (Goldberg, J., concurring) (privacy guarantees). In general, however, the right of a legal parent to the care and custody of his or her child derives from the notion of privacy. According to M.J.B., that right entitles her to absolute preference over V.C. in connection with custody and visitation of the twins. She argues that V.C., a stranger, has no standing to bring this action. We disagree.
The right of parents to the care and custody of their children is not absolute. For example, a legal parent's fundamental right to custody and control of a child may be infringed upon by the state if the parent endangers the health or safety of the child. Wisconsin v. Yoder, 406 U.S. 205, 233-34, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15, 35 (1972); Prince v. Massachusetts, 321 U.S. 158, 166-67, 64 S.Ct. *549 438, 442, 88 L.Ed. 645, 652-53 (1944). Likewise, if there is a showing of unfitness, abandonment or gross misconduct, a parent's right to custody of her child may be usurped. Watkins, supra, 163 N.J. at 237, 748 A.2d 558; Guardianship of K.H.O., 161 N.J. 337, 347, 736 A.2d 1246 (1999); Adoption of Child by D.M.H. & S.H., 135 N.J. 473, 481, 641 A.2d 235 (1994); New Jersey Div. of Youth Fam. Serv. v. K.M., 136 N.J. 546, 557, 643 A.2d 987 (1994); In re Adoption of Children by D., 61 N.J. 89, 95, 293 A.2d 171 (1972); Zack v. Fiebert, 235 N.J.Super. 424, 428, 563 A.2d 58 (App. Div.1989); D.T., supra, 200 N.J.Super. at 176, 491 A.2d 7.
According to M.J.B., because there is no allegation by V.C. of unfitness, abandonment or gross misconduct, there is no reason advanced to interfere with any of her constitutional prerogatives. What she elides from consideration, however, is the "exceptional circumstances" category (occasionally denominated as extraordinary circumstances) that has been recognized as an alternative basis for a third party to seek custody and visitation of another person's child. Watkins, supra, 163 N.J. at 247-48, 748 A.2d 558; D.T., supra, 200 N.J.Super. at 176, 491 A.2d 7. The "exceptional circumstances" category contemplates the intervention of the Court in the exercise of its parens patriae power to protect a child. Sorentino v. Family & Children's Soc'y of Elizabeth, 72 N.J. 127, 132, 367 A.2d 1168 (1976); Adoption of M., 317 N.J.Super. 531, 541, 722 A.2d 615 (Ch. Div.1998); see also Sider v. Sider, 334 Md. 512, 639 A.2d 1076, 1085 (1994)(stating that presumption of parental fitness can be overcome upon showing of unfitness or exceptional circumstances); Cotton v. Wise, 977 S.W.2d 263, 265 (Mo.1998)(requiring unfitness, abandonment, or extraordinary circumstances before terminating parental rights); Merritt v. Way, 58 N.Y.2d 850, 460 N.Y.S.2d 20, 446 N.E.2d 776, 777 (1983)(stating that surrender, abandonment, unfitness, persistent neglect, or other extraordinary circumstance will result in termination of right to custody).
Subsumed within that category is the subset known as the psychological parent cases in which a third party has stepped in to assume the role of the legal parent who has been unable or unwilling to undertake the obligations of parenthood. Sorentino, supra, 72 N.J. at 132, 367 A.2d 1168 (acknowledging that before court would remove child from foster home and return to biological parents, hearing was necessary to determine whether child would be psychologically harmed by the separation from his foster parents); Matter of Adoption of Child by P.S., 315 N.J.Super. 91, 94-95, 716 A.2d 1171 (App. Div.1998) (stating that court must consider whether child bonded and formed psychological relationship with foster parents before custody rights of natural parent could be asserted); Guardianship of J.T., 269 N.J.Super. 172, 190, 634 A.2d 1361 (App.Div.1993) (finding transfer of child from foster mother, who acted as psychological parent, to biological mother was barred because overwhelming evidence existed that psychological harm to child would result); Todd v. Sheridan, 268 N.J.Super. 387, 398, 633 A.2d 1009 (App. Div.1993) (applying best interest standard in custody dispute between four year old's biological father and maternal grandparents, who lived with child and acted as psychological parents); Zack v. Fiebert, 235 N.J.Super. 424, 433, 563 A.2d 58 (App. Div.1989) (establishing that maternal grandparents, who were not psychological parents, needed to prove biological father's unfitness to obtain custody, not simply best interests); D.T., supra, 200 N.J.Super. at 175, 491 A.2d 7 (App.Div.1985) (finding that maternal grandparents, with whom grandchild and biological mother resided, were not entitled to custody of grandchild upon death of biological mother because grandparents failed to demonstrate that they were psychological parents); Hoy v. Willis, 165 N.J.Super. 265, 277, 398 A.2d 109 (App.Div.1978) (finding *550 that best interests of child required that custody of child be granted to maternal aunt with whom child was voluntarily placed by natural mother and with whom child had developed a psychological parent relationship); Guardianship of D., C., E. & A., 169 N.J.Super. 230, 242, 404 A.2d 663 (Camden County Ct.1979) (finding that foster parents, who were child's psychological parents, were entitled to custody over natural parents who had lacked contact for over four years).
Cases in other jurisdictions have also recognized the psychological parent doctrine. Carter v. Brodrick, 644 P. 2d 850, 855 (Alaska 1982)(acknowledging that step-parents who stand in loco parentis have ability to petition for visitation); Custody of C.C.R.S., 892 P.2d 246, 247 (Colo.1995)(holding that best interest test applies to determine custody between biological and psychological parents); Simpson v. Simpson, 586 S.W.2d 33, 35 (Ky.1979)(recognizing that nonparent who stands in loco parentis may petition for custody); E.N.O. v. L.M.M., 429 Mass. 824, 711 N.E.2d 886, 893-94 (1999) (holding that trial court had jurisdiction to award visitation between child and de facto parent); In Matter of J.W.F., 799 P.2d 710, 714 (Utah 1990) ("[T]he fact that a person is not a child's natural or legal parent does not mean that he or she must stand as a total stranger to the child where custody is concerned. Certain people, because of their relationship to a child, are at least entitled to standing to seek a determination as to whether it would be in the best interests of the child for them to have custody."); Custody of H.S.H.-K., 193 Wis.2d 649, 533 N.W.2d 419, 421 (1995)(outlining four prong test for establishing de facto parent relationship).
At the heart of the psychological parent cases is a recognition that children have a strong interest in maintaining the ties that connect them to adults who love and provide for them. That interest, for constitutional as well as social purposes, lies in the emotional bonds that develop between family members as a result of shared daily life. Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14, 35 (1977). That point was emphasized in Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614, 626 (1983), where the Supreme Court held that a stepfather's actual relationship with a child was the determining factor when considering the degree of protection that the parent-child link must be afforded. The Court stressed that
the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in `promot[ing] a way of life' through the instruction of children as well as from the fact of blood relationship.

[Ibid.]
To be sure, prior cases in New Jersey have arisen in the context of a third party taking over the role of an unwilling, absent or incapacitated parent. The question presented here is different; V.C. did not step into M.J.B.'s shoes, but labored alongside her in their family. However, because we view this issue as falling broadly within the contours we have previously described, and because V.C. invokes the "exceptional circumstances" doctrine based on her claim to be a psychological parent to the twins, she has standing to maintain this action separate and apart from the statute.

IV
The next issue we confront is how a party may establish that he or she has, in fact, become a psychological parent to the child of a fit and involved legal parent. That is a question which many of our sister states have attempted to answer. Some have enacted statutes to address the subject by deconstructing psychological parenthood to its fundamental elements, including: the substantial nature of the *551 relationship between the third party and the child, see, e.g., Ariz.Rev.Stat. Ann. § 25-415(G)(1) (West 2000); whether or not the third party and the child actually lived together, see, e.g., Minn.Stat. Ann. § 257.022(2b) (West 1999); Tex. Fam.Code Ann. § 102.003(a)(9)(West 1999); and whether the unrelated third party had previously provided financial support for the child, see, e.g. 1999 Nev. Stat. 125A.330(3)(I).
Several state courts have attempted to refine the concept further. For example, the Supreme Judicial Court of Massachusetts has recently addressed the issue of granting a person it denominated as a child's de facto parent the right to visitation. E.N.O. v. L.M.M., 429 Mass. 824, 711 N.E.2d 886 (1999). In E.N.O., the court defined a de facto parent as
one who has no biological relation to the child, but has participated in the child's life as a member of the child's family. The de facto parent resides with the child and, with the consent and encouragement of the legal parent, performs a share of care taking functions at least as great as the legal parent. The de facto parent shapes the child's daily routine, addresses his developmental needs, disciplines the child, provides for his education and medical care, and serves as a moral guide.
[Id. at 891 (citation and footnote omitted) ].
Additionally, the court noted that a de facto parent performs those functions "for reasons primarily other than financial compensation." Id. at 891 n. 6.
Similarly, in Carter v. Brodrick, 644 P.2d 850 (Alaska 1982), the Alaska Supreme Court defined the nature of the relationship that gives rise to a finding that the third party acted as a psychological parent. The court stated that the psychological parent is
one who, on a day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological need for an adult. This adult becomes an essential focus of the child's life, for he is not only the source of the fulfillment of the child's physical needs, but also the source of his emotional and psychological needs.

[Id. at 853 n. 2.]
The most thoughtful and inclusive definition of de facto parenthood is the test enunciated in Custody of H.S.H.-K., 193 Wis.2d 649, 533 N.W.2d 419, 421 (1995), and adopted by the Appellate Division majority here. It addresses the main fears and concerns both legislatures and courts have advanced when addressing the notion of psychological parenthood. Under that test,
[t]o demonstrate the existence of the petitioner's parent-like relationship with the child, the petitioner must prove four elements: (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed the obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation [a petitioner's contribution to a child's support need not be monetary]; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.
[Custody of H.S.H.-K., supra, 533 N.W.2d at 421 (footnote omitted).]
Recapping, the legal parent must consent to and foster the relationship between the third party and the child; the third party must have lived with the child; the third party must perform parental functions for the child to a significant degree; and most important, a parent-child bond must be forged. We are satisfied that that test provides a good framework *552 for determining psychological parenthood in cases where the third party has lived for a substantial period with the legal parent and her child.[6]
Prong one is critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child. Without such a requirement, a paid nanny or babysitter could theoretically qualify for parental status. To avoid that result, in order for a third party to be deemed a psychological parent, the legal parent must have fostered the formation of the parental relationship between the third party and the child. By fostered is meant that the legal parent ceded over to the third party a measure of parental authority and autonomy and granted to that third party rights and duties vis-a-vis the child that the third party's status would not otherwise warrant. Ordinarily, a relationship based on payment by the legal parent to the third party will not qualify.
The requirement of cooperation by the legal parent is critical because it places control within his or her hands. That parent has the absolute ability to maintain a zone of autonomous privacy for herself and her child. However, if she wishes to maintain that zone of privacy she cannot invite a third party to function as a parent to her child and cannot cede over to that third party parental authority the exercise of which may create a profound bond with the child.
Two further points concerning the consent requirement need to be clarified. First, a psychological parent-child relationship that is voluntarily created by the legally recognized parent may not be unilaterally terminated after the relationship between the adults ends. Although the intent of the legally recognized parent is critical to the psychological parent analysis, the focus is on that party's intent during the formation and pendency of the parent-child relationship. The reason is that the ending of the relationship between the legal parent and the third party does not end the bond that the legal parent fostered and that actually developed between the child and the psychological parent. Thus, the right of the legal parent
[does] not extend to erasing a relationship between her partner and her child which she voluntarily created and actively fostered simply because after the party's separation she regretted having done so.
[J.A.L. v. E.P.H., 453 Pa.Super. 78, 682 A.2d 1314, 1322 (1996)(footnote omitted).]
In practice, that may mean protecting those relationships despite the later, contrary wishes of the legal parent in order to advance the interests of the child. As long as the legal parent consents to the continuation of the relationship between another adult who is a psychological parent and the child after the termination of the adult parties' relationship, the courts need not be involved. Only when that consent is withdrawn are courts called on to protect the child's relationship with the psychological parent.
The second issue that needs to be clarified is that participation in the decision to have a child is not a prerequisite to a finding that one has become a psychological parent to the child. We make that point because the trial court appeared to view the fact that M.J.B. alone made the decision to have the twins as pivotal to the question of the existence of a psychological *553 parent relationship between V.C. and the children. Although joint participation in the family's decision to have a child is probative evidence of the legally recognized parent's intentions, not having participated in the decision does not preclude a finding of the third party's psychological parenthood. Such circumstances parallel the situation in which a woman, already pregnant or a mother, becomes involved with or marries a man who is not the biological or adoptive father of the child, but thereafter fully functions in every respect as a father. There is nothing about that scenario that would justify precluding the possibility of denominating that person as a psychological parent. It goes without saying that adoption proceedings in these circumstances would eliminate the need for a psychological parent inquiry altogether and would be preferable to court intervention. However, the failure of the parties to pursue that option is not preclusive of a finding of psychological parenthood where all the other indicia of that status are present.
Concerning the remaining prongs of the H.S.H.-K. test, we accept Wisconsin's formulation with these additional comments. The third prong, a finding that a third party assumed the obligations of parenthood, is not contingent on financial contributions made by the third party. Financial contribution may be considered but should not be given inordinate weight when determining whether a third party has assumed the obligations of parenthood. Obviously, as we have indicated, the assumption of a parental role is much more complex than mere financial support. It is determined by the nature, quality, and extent of the functions undertaken by the third party and the response of the child to that nurturance.
Indeed, we can conceive of a case in which the third party is the stay-at-home mother or father who undertakes all of the daily domestic and child care activities in a household with preschool children while the legal parent is the breadwinner engaged in her occupation or profession. Although it is always possible to put a price on the contributions of the stay-at-home parent, see Martha M. Ertman, Commercializing Marriage: A Proposal for Valuing Women's Work Through Premarital Security Agreements, 77 Tex. L.Rev. 17, 43 (1998)(outlining different economic models for placing value on homemaker's contribution), our point is that such an analysis is not necessary because it is the nature of what is done that will determine whether a parent-child bond has developed, not how much it is worth in dollars.
It bears repeating that the fourth prong is most important because it requires the existence of a parent-child bond. A necessary corollary is that the third party must have functioned as a parent for a long enough time that such a bond has developed. What is crucial here is not the amount of time but the nature of the relationship. How much time is necessary will turn on the facts of each case including an assessment of exactly what functions the putative parent performed, as well as at what period and stage of the child's life and development such actions were taken. Most importantly, a determination will have to be made about the actuality and strength of the parent-child bond. Generally, that will require expert testimony.
The standards to which we have referred will govern all cases in which a third party asserts psychological parent status as a basis for a custody or visitation action regarding the child of a legal parent, with whom the third party has lived in a familial setting.

V
This opinion should not be viewed as an incursion on the general right of a fit legal parent to raise his or her child without outside interference. What we have addressed here is a specific set of circumstances involving the volitional choice of a legal parent to cede a measure of parental *554 authority to a third party; to allow that party to function as a parent in the day-to-day life of the child; and to foster the forging of a parental bond between the third party and the child. In such circumstances, the legal parent has created a family with the third party and the child, and has invited the third party into the otherwise inviolable realm of family privacy. By virtue of her own actions, the legal parent's expectation of autonomous privacy in her relationship with her child is necessarily reduced from that which would have been the case had she never invited the third party into their lives. Most important, where that invitation and its consequences have altered her child's life by essentially giving him or her another parent, the legal parent's options are constrained. It is the child's best interest that is preeminent as it would be if two legal parents were in a conflict over custody and visitation. Zack, supra, 235 N.J.Super. at 432, 563 A.2d 58.

VI
Once a third party has been determined to be a psychological parent to a child, under the previously described standards, he or she stands in parity with the legal parent. Ibid. Custody and visitation issues between them are to be determined on a best interests standard giving weight to the factors set forth in N.J.S.A. 9:2-4:
the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children.
That is not to suggest that a person's status as a legal parent does not play a part in custody or visitation proceedings in those circumstances. Indeed, as the Appellate Division stated in Todd v. Sheridan, 268 N.J.Super. 387, 399, 633 A.2d 1009 (App.Div.1993):
No fair reading of [Zack] prohibits a judge from considering any aspect of either party's character or status in assessing the best interests of the child. N.J.S.A. 9:2-4. Obviously, as the trial judge recognized, he was not free to give an absolute preference to [the natural parent] because that would have undermined the salutary aims Zack was meant to accomplish. However, he was free to consider [the natural parent's] status as [the child's] biological father as one weight in the best interests balance.
We agree. The legal parent's status is a significant weight in the best interests balance because eventually, in the search for self-knowledge, the child's interest in his or her roots will emerge. Thus, under ordinary circumstances when the evidence concerning the child's best interests (as between a legal parent and psychological parent) is in equipoise, custody will be awarded to the legal parent.
Visitation, however, will be the presumptive rule, subject to the considerations set forth in N.J.S.A. 9:2-4, as would be the case if two natural parents were in conflict. As we said in Beck v. Beck, 86 N.J. 480, 495, 432 A.2d 63 (1981), visitation rights are almost "invariably" granted to the non-custodial parent. Indeed, "[t]he denial of visitation rights is such an extraordinary proscription that it should be invoked only in those exceptional cases where it clearly and convincingly appears *555 that the granting of visitation will cause physical or emotional harm to the children or where it is demonstrated that the parent is unfit." Barron v. Barron, 184 N.J.Super. 297, 303, 445 A.2d 1182 (Ch. Div.1982); see also, Wilke v. Culp, 196 N.J.Super. 487, 503, 483 A.2d 420 (App. Div.1984) (requiring clear and convincing evidence of exceptional circumstance to warrant denial of visitation). Once the parent-child bond is forged, the rights and duties of the parties should be crafted to reflect that reality.

VII
Ordinarily, when we announce a new standard, we remand the case to the trial court for reconsideration. That is not necessary here. This full record informs us that M.J.B. fostered and cultivated, in every way, the development of a parent-child bond between V.C. and the twins; that they all lived together in the same household as a family; that despite M.J.B.'s after-the-fact characterizations of V.C. as a "stranger" and a "nanny," V.C. assumed many of the day-to-day obligations of parenthood toward the twins, including financial support; and that a bonded relationship developed between V.C. and the twins that is parental in nature. In short, we agree with the Appellate Division that V.C. is a psychological parent to the twins.
That said, the issue is whether V.C. should be granted joint legal custody and visitation. As we have stated, the best interests standard applies and the factors set forth in N.J.S.A. 9:2-4 come into play. Under that statute V.C. and M.J.B. are essentially equal. Each appears to be a fully capable, loving parent committed to the safety and welfare of the twins. Although there is animosity between V.C. and M.J.B., that is not a determinant of whether V.C. can continue in the children's lives.
We note that V.C. is not seeking joint physical custody, but joint legal custody for decision making. However, due to the pendency of this case, V.C. has not been involved in the decision-making for the twins for nearly four years. To interject her into the decisional realm at this point would be unnecessarily disruptive for all involved. We will not, therefore, order joint legal custody in this case.
Visitation, however, is another matter. V.C. and the twins have been visiting during nearly all of the four years since V.C. parted company from M.J.B. Continued visitation in those circumstances is presumed. Nothing suggests that V.C. should be precluded from continuing to see the children on a regular basis. Indeed, it is clear that continued regular visitation is in the twins' best interests because V.C. is their psychological parent. We thus affirm the judgment of the Appellate Division.

VIII
Third parties who live in familial circumstances with a child and his or her legal parent may achieve, with the consent of the legal parent, a psychological parent status vis-a-vis a child. Fundamental to a finding of the existence of that status is that a parent-child bond has been created. That bond cannot be unilaterally terminated by the legal parent. When there is a conflict over custody and visitation between the legal parent and a psychological parent, the legal paradigm is that of two legal parents and the standard to be applied is the best interests of the child.
Establishing psychological parenthood is not an easy task and the standards we have adopted should be scrupulously applied in order to protect the legal parent-child relationship.
O'HERN, J., concurring.
I concur in the opinion and judgment of the Court. I agree that the degree of intrusion on parental autonomy is properly resolved here by the standard set forth in the Court's opinion. I adhere to the views expressed in my dissenting opinion in Watkins *556 v. Nelson, 163 N.J. 235, 748 A. 2d 558 (2000), that the determination of custody following the death of a custodial parent requires a different standard in order to protect a grieving child from being removed from her home before she may be able to bear the twin losses of a parent and the familiar presence of those family members who, until then, had provided her nurture and love.
LONG, J., concurring.[1]
Sociologists who study the family have concluded that, like all social institutions, it has certain attributes or characteristics. Two of those are the stability of the parents' relationship and parental nurturing. Ernest W. Burgess and Harvey J. Locke, The Family: From Institution to Companionship, 651 (1953); Lee E. Teitelbaum, Family History and Family Law 1985 Wis. L.Rev. 1135, 1142-43 (1985). A third characteristic identified by scholars is the family's claim to autonomous privacy. Craig W. Christensen, If Not Marriage? On Securing Gay & Lesbian Family Values by a "Simulacrum of Marriage", 66 Fordham L.Rev. 1699, 1717 (1998). That privacy association spawned the family's "awareness of itself as a precious emotional unit" demanding isolation from outside intrusion. Id. at 1718 (quoting Edward Shorter, The Making of the Modern Family, 227 (1975)). It also resulted in a concept of domestic privacy with an objective meaning; the family not only experienced itself as private, but was recognized as such by society. Teitelbaum, supra, 1985 Wisc. L.Rev. at 1144.
The dominant model of the American family, both emotionally and legally, is the nuclear family"a social institution with a sort of corporate identity: a collective of husband, wife, and children." Teitelbaum, supra, 1985 Wisc. L.Rev. at 1138. Over time, because of the dominance of the nuclear family in our collective consciousness, the attributes of family life came to be associated with it to the exclusion of any other model:
The stability of the companionate couple and the sustenance of parental nurturing were to become the quintessential American "family values." As a necessary corollary, in aid and protection of the values, came recognition of the family as an autonomous bastion of privacy. Although the nuclear family was merely the perceived repository of these valued characteristics, eventually it came to be viewed by many as though it represented a value on its own right.
[Christensen, supra, 66 Fordham L.Rev. at 1718.]
That is a critical point for we should not be misled into thinking that any particular model of family life is the only one that embodies "family values." Those qualities of family life on which society places a premiumits stability, the love and affection shared by its members, their focus on each other, the emotional and physical care and nurturance that parents provide their offspring, the creation of a safe harbor for all involved, the wellspring of support family life provides its members, the ideal of absolute fealty in good and bad times that infuses the familial relationship (all of which justify isolation from outside intrusion)are merely characteristics of family life that, except for its communal aspect, are unrelated to the particular form a family takes.
Those attributes may be found in biological families, step-families, blended families, single parent families, foster families, families created by modern reproductive technology, and in families made up of unmarried persons. What is required is the creation of "an intimate familial relationship that is stable, enduring, substantial and mutually supportive, ... one that is cemented by strong emotional bonds and provides deep and pervasive emotional *557 security." Dunphy v. Gregor, 136 N.J. 99, 115, 642 A.2d 372 (1994).
Generally, such a relationship is built on a commitment by the adults to live as a family, accompanied by the actuality of family life, involving the love, care, nurturance, protection, safety and education of the children in their care. The relationship that develops between children and those who function as their parents, within that setting, ordinarily creates a life-long bond between them.
That bond is not the result of the sexual orientation of the adults or of their marital status. It does not arise solely from biology or legal adoption. Rather, it is borne out of the daily toil parents engage in to keep their children healthy and safe from harm; out of the love and attention provided to the children; and out of the unconditional regard returned by the children to the parental figures. When the bond exists, the parents and the children become a familyan entity greater than the sum of its parts.
What is crucial is to realize that a parent-child bond is not simply a court-bestowed determination for the purpose of resolving litigation. Certainly, it affects the status of custody and visitation litigation, but that is secondary. The finding of the existence of such a bond reflects that the singular emotional and spiritual connection, ordinarily only expected in the relationship of a legal parent and child, has been created between an adult and a child who are not related by blood or adoption. It is different from the bond between great friends or the bond between uncle and nephew, aunt and niece. It is the special connection between a parent and a child.
That there can be such a bond between a child and someone other than the child's legal parent is clear. Mere legality, whether by way of biology or adoption, is not an exclusive determinant of the existence of a parent-child relationship:
It has been recognized that the psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.
[Sees v. Baber, 74 N.J. 201, 222, 377 A.2d 628 (1977) (citing Goldstein, Freud & Solnit, Beyond the Best Interests of the Child (1973)).]
See also Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 843, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14, 34 (1977)("[B]iological relationships are not exclusive determination of the existence of a family.").
Moreover, our judicial system has long acknowledged that "courts are capable of dealing with the realities, not simply the legalities, of relationships" and have adjusted the rights and duties of parties in relation to that reality. Dunphy, supra, 136 N.J. at 111, 642 A.2d 372 (recognizing standing of unmarried cohabitant in bystander liability case); see also Crowe v. DeGioia, 90 N.J. 126, 133, 447 A.2d 173 (1982) (recognizing enforceability of support agreement between non-married cohabitants). As the Appellate Division aptly noted: "When social mores change, governing statutes must be interpreted to allow for those changes in a manner that does not frustrate the purposes behind their enactment." Adoption of Two Children by H.N.R., 285 N.J.Super. 1, 10, 666 A.2d 535 (App.Div.1995)(quoting Adoptions of B.L.V.B. & E.L.V.B., 160 Vt. 368, 628 A.2d 1271, 1275 (1993)). See also J.A.L. v. E.P.H., 453 Pa.Super. 78, 682 A.2d 1314, 1320 (1996) (urging flexibility to adapt to interests of each child given advent of non-traditional families).
In other words, the nuclear family of husband and wife and their offspring is not the only method by which a parent-child relationship can be created. The values attached to family life, although properly attributed to the nuclear family model, can exist in other settings, including families *558 created by unmarried persons regardless of their sexual orientation.
In the final analysis it is reality and not mere legality that should dictate who can be denominated as a psychological parent. Once the unique and profound parent-child bond is found to have been forged, the relationship between the psychological parent and the child is, for all intents and purposes, that of parent and child. It is only against that backdrop that the legal notion of psychological parenthood can be fully comprehended.
For affirmanceChief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN, LONG and VERNIERO7.
OpposedNone.
NOTES
[1] For the purpose of this opinion the term legal parent encompasses biological and adoptive parents.
[2] As noted by scholars, "Joint custody can be either joint legal and joint physical custody or joint legal custody with one parent having primary residential custody. Legal custody refers to decision making." Gary N. Skoloff & Laurence J. Cutler, New Jersey Family Law Practice, Custody § 4.2B (8th ed.1996).
[3] The terms psychological parent, de facto parent, and functional parent are used interchangeably in this opinion to reflect their use in the various cases, statutes, and articles cited. Psychological parent is the preferred term.
[4] We note that all fifty states, to one extent or another, grant statutory standing to third parties to petition for custody and/or visitation of the biological or adoptive children of others. Those statutes reveal a full spectrum of approaches. Examples are: Ark.Code Ann. § 9-13-102 to -103 (Michie 1999)(granting reasonable visitation rights to siblings, grandparents and great-grandparents); 750 Ill. Comp. Stat. Ann. § 5/607 (b)(1)(West 1999)(granting standing for visitation to grandparent, great-grandparent, or sibling if in child's best interests); Mo.Rev.Stat. § 452.402 (West 2000) (standing for grandparents to petition for visitation); Neb.Rev.Stat. Ann. § 43-1802 (1999) (granting standing to grandparents for visitation in certain circumstances); N.H.Rev.Stat. Ann. § 458:17-d (1999) (granting grandparents standing to petition for visitation); N.Y. Dom. Rel. Law § 72 (McKinney 1999)(standing for grandparents to petition for visitation if in child's best interests); N.D. Cent.Code § 14-09-05.1 (1999)(standing to grandparents for visitation unless not in the child's best interests).

The more expansive statutes allow third parties, without regard to blood relationship, to seek both custody and visitation. Examples include: Conn. Gen.Stat. Ann. § 46b-57,-59 (West 1999)(allowing custody or visitation to "any interested third-party ... upon such conditions and limitations as [the court] deems equitable"); Haw.Rev.Stat. Ann. § 571-46(2), (7)(West 1999)(granting standing to third persons for custody when in the best interests of child and granting de facto parent prima facie award of custody; visitation standing granted to "any person interested in the welfare of the child" in court's discretion); Mass. Gen. Laws Ann. ch. 208, § 28 (West 1999) (granting standing to any third party to petition for custody if court deems such award expedient or in child's best interest); Or.Rev.Stat. § 109.119(1)(granting standing to "[a]ny person ... who has established emotional ties" for either custody or visitation); Va.Code Ann. § 16.1-241(A)(Michie 1999)(granting standing to "any party with a legitimate interest" to petition for visitation or custody of child).
[5] The legislative grant of power is what distinguishes this case from West v. The Superior Court of Sacramento, 59 Cal.App.4th 302, 69 Cal.Rptr.2d 160 (1997); Van v. Zahorik, 227 Mich.App. 90, 575 N.W.2d 566 (1997), aff'd, 460 Mich. 320, 597 N.W.2d 15 (1999); and Titchenal v. Dexter, 166 Vt. 373, 693 A.2d 682 (1997), cited by M.J.B. for the proposition that we lack jurisdiction over V.C.'s claim. Each of those cases was decided based on an absence of legislative authority evidenced by a legislative scheme that did not include the kind of language employed here.
[6] Obviously, the notion of consent will have different implications in different factual settings. For example, where a legal parent voluntarily absents herself physically or emotionally from her child or is incapable of performing her parental duties, those circumstances may constitute consent to the parental role of a third party who steps into her shoes relative to the child. As in all psychological parent cases, the outcome in such a case will depend on the full factual complex and the existence of the other factors contained in the test.
[1] See Negron v. Llarena, 156 N.J. 296, 716 A.2d 1158 (1998)(reflecting that author of majority opinion is free to add remarks in concurring opinion).