**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3655-23

C.S., [1]

    Plaintiff-Appellant,

v.

A.N.S. and C.H.,

    Defendants-Respondents.

_____

        Submitted May 14, 2025 – Decided July 21, 2025

        Before Judges Paganelli and Torregrossa-O'Connor.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FD-08-0134-22.

        Maleski, Eisenhut & Zielinski, LLC, attorneys for appellant (Adam Eisenhut, of counsel and on the brief).

        Respondents have not filed a brief.

PER CURIAM

---

[1] We refer to the parties by initials and use fictitious names for the child to protect confidentiality. See R. 1:38-3(d)(3).

In this non-dissolution matter, plaintiff, C.S., appeals from a June 26, 2024 Family Part order granting defendant A.N.S.'s application for expanded parenting time with A.N.S.'s daughter, Lucy, born in 2015. Because there were disputed issues of fact, we conclude it was necessary for the court to conduct a plenary hearing and make findings addressing the controlling legal standard applicable to psychological parents. Therefore, we reverse the order.

I.

The history of this matter is largely undisputed. A.N.S. battled substance addiction most of her life, causing C.S. to take responsibility for her granddaughter Lucy, from the time Lucy was born. In 2021, C.S. filed an emergent order to show cause seeking custody of Lucy due to concerns for Lucy's safety in A.N.S.'s care. The parties resolved the matter in a 2021 consent order, granting C.S. "sole legal and physical custody" of Lucy and designating C.S. as Lucy's psychological parent. The parties, including Lucy's biological father, C.H., executed the agreement and acknowledged "[C.S.] ha[d] been solely responsible for the care and upbringing . . . [of Lucy] . . . throughout the entirety of her life." By separate order that same date, and based on C.S.'s expressed desire to allow A.N.S. supervised access to the child, the court permitted A.N.S. visits with Lucy "every Sunday at . . . noon as agreed and

2

arranged between the parties, at all time[s] supervised by [C.S.]," and supervised "FaceTime calls" with Lucy, initiated by C.S. three times weekly. The second order noted A.N.S. was in a substance treatment program, and A.N.S. would provide monthly treatment reports directly to C.S.

In 2023, A.N.S. filed a motion seeking custody of Lucy, and C.S. opposed the application and cross-moved to compel drug testing of A.N.S. After A.N.S. failed to appear for the hearing, and her initial application was accordingly dismissed, A.N.S. filed a second application in late 2023 seeking increased parenting time. A.N.S. claimed she had been drug-free, but submitted a summary from a drug treatment program indicating two positive drug screens in June and August 2023 and constant positive results for "medicinal levels of marijuana." By order dated December 12, 2023, the court granted A.N.S. additional supervised visitation with Lucy in the mornings on Christmas, Easter, and New Years' Day, and ordered that C.S. provide notice to A.N.S. of Lucy's scheduled activities.

Months later, A.N.S. filed another application for expanded custody and parenting time, and C.S. again opposed it, providing a certification from A.N.S.'s roommate/landlord indicating A.N.S. was still using drugs and overdosed twice in 2023. C.S. opposed expansion of the arrangement, citing

A.N.S.'s "long and documented history of serious substance abuse, mental illness, parental neglect," and "threats to abscond with [Lucy]." C.S. also provided a detailed chronology of A.N.S.'s lifelong substance addiction, including her enrollment in over twenty treatment programs after which A.N.S. never retained sustained sobriety. C.S. certified that A.N.S. also suffered from unmanaged bipolar disorder, and provided written communications with A.N.S. in which A.N.S. refused to comply with medically recommended treatment for that condition.

At the hearing on June 25, 2024, C.S. stated she had not been provided with A.N.S.'s ex parte submissions to the court. The court then advised:

> [T]hey're basically some certifications indicating that she hasn't had a problem. The only problem she had, if you want to call it a problem, was like six months ago or so or actually seven months ago. Where she tested positive for a small amount, the[] person who administered . . . the test indicated she didn't think it was a particular issue. And I think there was some medicinally . . . equivalent standards of marijuana.

C.S.'s counsel emphasized the information C.S. submitted regarding A.N.S.'s recent overdoses, and the court responded, "That was about a year ago, though, wasn't it?" Counsel clarified that it was "late 2023," and cited to C.S.'s certification indicating that in recent supervised visits, A.N.S. appeared to be in a "manic state, detached." C.S. also presented motor vehicle tickets, which

4

counsel argued showed A.N.S. would use substances and then drive recklessly. When the court asked A.N.S. about her bipolar condition, A.N.S. admitted her bipolar diagnosis, adding she was "not on any medication" as she "d[id not] desire to be on medication."

The court then stated, "If you're uncomfortable with the overnights, okay. I'm cool with that. But I'm . . . expand[ing] the hours." The court stated:

> I haven't heard anything that's fresh except for affidavits that—they're affidavits. . . . I haven't seen these people who've signed them. I haven't heard their testimony. They're on a piece of paper. We . . . know the[re are] hearsay rules. So, I'm not go[ing to] get caught up in that kind of stuff.
>
> So, . . . let's talk about how we're go[ing to] exp[a]nd it.

C.S.'s counsel then emphasized the parties had previously consented to their arrangement and suggested the court was improperly approaching the application with the presumption that contact should be expanded. Counsel argued that custody and parenting time had been set by agreement, and there was no record or evidence to suggest that any modification should occur at that time. The court responded, "Okay. Thank you. We're go[ing to] increase the time now." C.S. interjected that she did not necessarily oppose some form of increased supervised time, but referenced her concern regarding times A.N.S.

5

did not call the child as scheduled, or "came in all high," despite claiming she was drug-free.

The court continued, reiterating it was increasing A.N.S.'s parenting time. The court added:

> If in fact . . . she shows up high, then call the police[.] I'll get a police report. I'll get a third party to investigate. Call [DCPP]. I'll get a third party to investigate. And I'll review that. Okay. But I'm not go[ing to] do it based on a year[-]old affidavit or something that happened a year . . . ago.
>
> So, let's keep it current.

Over C.S.'s objection, the court first extended in-person supervised parenting time on Sundays to six hours, from 12:00 p.m. until 6:00 p.m. C.S. attempted to advise the court that Lucy barely "handles the two hours." The court replied it was taking Lucy's needs into account but stated, "We're talking about [M]om's needs." The court then modified and increased the Sunday visit from 12:00 p.m. until 5:00 p.m. The court ordered A.N.S. to provide a hair follicle test result and information concerning her bipolar diagnosis and treatment.

C.S.'s counsel then inquired, "[W]hat's the end point in . . . the [c]ourt's mind for this?" The court responded: "I would think the end point at some . . . point, would be that [M]om would regain custody of her child."

6

Counsel requested a hearing based on "disputed facts" concerning custody and parenting time and A.N.S.'s condition. The court responded, "[T]he end goal in every case is reunification. Okay. Take a look at the case law, you'll see that." C.S. again referenced her concerns regarding A.N.S.'s past history and current condition, and the court responded:

> If you could listen, please. I did not remove the supervisory condition. I did not order overnights. I've expanded . . . by a couple of hours. . . . I've asked for reports from therapists. I've asked for [a] hair follicle test. . . . I don't know what more you want me to do. I'm making a jump through hoops now. . . .

This appeal followed.

## II.

C.S. argues the court failed to apply the correct legal standard and erroneously expanded parenting time, modifying the parties' existing agreement without a hearing on material disputed issues of fact.

The scope of our review of Family Part orders is limited. See Cesare v. Cesare, 154 N.J. 394, 411 (1998). We afford substantial deference to the Family Part's findings of fact based on adequate, substantial, and credible evidence in the record, understanding the court's special expertise in family matters. Id. at 413; MacKinnon v. MacKinnon, 191 N.J. 240, 253-54 (2007). No special

deference is accorded to the judge's legal conclusions, <u>Manalapan Realty, L.P.</u> <u>v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995); however,

> we "should not disturb the factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice" or when we determine the court has palpably abused its discretion.
>
> [<u>Parish v. Parish</u>, 412 N.J. Super. 39, 47 (App. Div. 2010) (quoting <u>Cesare</u>, 154 N.J. at 412).]

A "fit parent" enjoys "a superior right to custody of his or her child as against third parties." <u>Watkins v. Nelson</u>, 163 N.J. 235, 245 (2000). That right is similarly "rooted in the tradition and conscience of our people as to be ranked as fundamental." <u>Ibid.</u> (quoting <u>Griswold v. Connecticut</u>, 381 U.S. 479, 487 (1965)). Thus, "a presumption of custody exists in favor of the parent." <u>Id.</u> at 244.

To modify an order establishing custody or parenting time, whether temporary or permanent, a party must first demonstrate a prima facie showing of changed circumstances. <u>See</u> <u>R.K. v. F.K.</u>, 437 N.J. Super. 58, 62 (App. Div. 2014). The court must then hold a plenary hearing if it determines a "genuine and substantial" dispute over the requested change occurs. <u>Hand v. Hand</u>, 391 N.J. Super. 102, 105 (App. Div. 2007); <u>R.</u> 5:8-6. In deciding whether to order a

change in custody, the court should consider the best interests of the child. See R.K., 437 N.J. Super. at 61-62.

Unlike a child's legal parents, grandparents have no inherent rights to custody of a child. See Watkins, 163 N.J. at 245. Likewise, a grandparent or other third party granted custody by way of court order does not bestow parental rights upon that third party. See Tortorice v. Vanartsdalen, 422 N.J. Super. 242, 251-52 (App. Div. 2011). However, "[t]he right of parents to the care and custody of their children is not absolute." V.C. v. M.J.B., 163 N.J. 200, 218 (2000). Although there is a presumption in favor of a natural parent's "right to the care, custody, and control of his or her child," this presumption supporting the parent "will be overcome by 'a showing of gross misconduct, unfitness, neglect, or "exceptional circumstances" affecting the welfare of the child[.]'" K.A.F. v. D.L.M., 437 N.J. Super. 123, 131-32 (App. Div. 2014) (alteration in original) (quoting Watkins, 163 N.J. at 246).

One exceptional circumstance that supersedes the presumption in favor of the natural parent arises when a third party has assumed the role of the child's "psychological parent," defined as a "third party [who] has stepped in to assume the role of the legal parent who has been unable or unwilling to undertake the obligations of parenthood." V.C., 163 N.J. at 219 (citing Sorentino v. Fam. &

9

Child.'s Soc'y of Elizabeth, 72 N.J. 127, 132 (1976)). In order to be recognized as a psychological parent, the third party must file a petition with the court. See Lewis v. Harris, 188 N.J. 415, 450 n.20 (2006). The court must then determine whether that third party is the child's psychological parent, and only then shall that parent "stand[] in parity with the legal parent." V.C., 163 N.J. at 227 (citing Zack v. Fiebert, 235 N.J. Super. 424, 432 (App. Div. 1989)).

A third party establishing exceptional circumstances by proving psychological parentage "may rebut the presumption in favor of a parent seeking custody even if he or she is deemed to be a fit parent." Watkins, 163 N.J. at 247-48. "In such circumstances, the legal parent has created a family with the third party and the child . . . essentially giving [the child] another parent." V.C., 163 N.J. at 227. Once the court determines a third party is a child's psychological parent, "he or she stands in parity with the legal parent" such that "[c]ustody and visitation issues between them are to be determined on a best interests [of the child] standard." Id. at 227-28 (citing Zack, 235 N.J. Super. at 432).

In V.C. our Supreme Court set forth four elements that must be met in order for a third party to establish psychological parentage:

> [(1)] the legal parent must consent to and foster the relationship between the third party and the child; [(2)]

the third party must have lived with the child; [(3)] the third party must perform parental functions for the child to a significant degree; and [(4)] most important, a parent-child bond must be forged.

[Id. at 223.]

In discussing the fourth element, the Court stated, "What is crucial here is not the amount of time but the nature of the relationship. . . . Generally, that will require expert testimony." Id. at 226-27.

Here, the parties agreed years ago that C.S. holds the status of Lucy's psychological parent; and the record contains no suggestion the parties now dispute C.S.'s role in Lucy's life. They further consented to C.S.'s sole legal and physical custody of Lucy. These are not minor, inconsequential designations. They carry with them special significance under the law, and more importantly, to the child. Accordingly, any changes to custody and parenting time must be carefully considered under controlling legal standards.

Given the parties agreed C.S. was a psychological parent, and the existing custody order and the primary parenting role C.S. has performed since Lucy's birth, A.N.S.'s application for modification to custody or visitation required the court to address whether A.N.S. demonstrated changed circumstances, and whether any modification to the agreed-upon arrangement was in Lucy's best interests. A plenary hearing was warranted, under the correct legal standards,

11

given C.S.'s concerns about Lucy's welfare in light of A.N.S.'s alleged unaddressed mental health issues and continued drug use. These disputed issues could not be resolved by certifications and naked representations.

Accordingly, we reverse the court's June 26, 2024 order. The 2021 consent order remains in effect. We recognize significant time has passed since the court entered its order, and circumstances may have changed impacting the custody and parenting time issues. Thus, the parties may make any applications they deem appropriate. However, any applications to modify the existing custody and parenting time will require a plenary hearing. We deny C.S.'s request that the matter be remanded to a different judge for any future proceedings, as we are satisfied that this opinion has provided the necessary guidance for any judge moving forward.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division