928 A.2d 71 (2007)
395 N.J. Super. 18
M.F., Appellant,
v.
DEPARTMENT OF HUMAN SERVICES, DIVISION OF FAMILY DEVELOPMENT, Respondent.
Superior Court of New Jersey, Appellate Division.
Argued January 16, 2007.
Decided July 18, 2007.
*73 Lee Ginsburg, argued the cause for appellant (South Jersey Legal Services, attorneys; Mr. Ginsburg, on the brief).
Dennis J. Conklin, Senior Deputy Attorney General, argued the cause for respondent (Stuart Rabner, Attorney General, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel; Stephanie Beaty, Deputy Attorney General, on the brief).
Before Judges LINTNER, S.L. REISNER and C.L. MINIMAN.
The opinion of the court was delivered by
MINIMAN, J.A.D.
M.F. appeals the final decision of the Division of Family Development (DFD), *74 Department of Human Services (DHS), rejecting the decision of the Office of Administrative Law (OAL) and affirming the action of the Camden County Board of Social Services (CCBSS). The CCBSS terminated the Temporary Assistance for Needy Families (TANF) benefit component of the Work First New Jersey (WFNJ) program[1] that it had been paying for the benefit of J.M., a minor, prior to the death of J.M.'s mother because there was no blood or legal relationship between J.M. and M.F., a prerequisite for receipt of TANF benefits. We affirm.

I.
J.M. was born on June 28, 1995, to D.M. They both began to reside with M.F. in 1996. J.M. was not the biological son of M.F.J.M. is a special-needs child diagnosed with a specific learning disability who attends a special education class. M.F. and D.M. had one child in common, M.F., Jr., who was born after they began to cohabit. Although they never married, M.F. and D.M. lived together continuously as a family unit with the two children until the sudden, unexpected death of D.M. on March 5, 2005, from a brain aneurism. M.F. at all relevant times provided J.M. with financial and emotional support. Prior to D.M.'s death, M.F. was receiving $305 per month in TANF benefits for both children. Effective March 1, 2005, the CCBSS reduced the TANF benefits payable to M.F. to $154 on the ground that there was no blood or legal relationship between M.F. and J.M.
It is undisputed that M.F. never adopted J.M., nor did he secure a judgment granting him legal guardianship. After D.M.'s death J.M. continued to live with M.F., who continued to provide J.M. with financial and emotional support and in all respects acted as J.M.'s father. Indeed, M.F. and J.M. apparently have a bonded parent-child relationship similar to that of father and son. No able and willing blood relatives have made themselves available to care for J.M.J.M.'s putative biological father[2] passed away in 2004. Prior to his death, he had no relationship with J.M. and provided no financial support for him.
After the death of D.M., the CCBSS notified M.F. on March 17, 2005, that his benefits changed from $305 to $154 effective March 1, 2005. M.F. timely appealed the CCBSS determination and the matter was referred to the OAL as a contested case. M.F. and the CCBSS agreed to submit the case on stipulated facts and sought a legal determination by the OAL of the impact of V.C. v. M.J.B., 163 N.J. 200, 748 A.2d 539, cert. denied, 531 U.S. 926, 121 S.Ct. 302, 148 L.Ed.2d 243 (2000), on the proper interpretation of the term "legally related" as used in N.J.S.A. 44:10-34 and N.J.A.C. 10:90-2.7(a). The Administrative Law Judge (ALJ) concluded that our Supreme Court's recognition of the legal rights of a "psychological parent" to custody and visitation, V.C., supra, 163 N.J. at 230, 748 A.2d 539, should apply to the interpretation of the term "legally related" as used in the WFNJ/TANF. As a consequence, the ALJ concluded that the stipulated facts supported a conclusion that M.F. was a "psychological parent" to J.M. and that such a parent was "legally related" within the meaning of the WFNJ/TANF, entitling M.F. to TANF benefits for J.M.
On appeal by the CCBSS, the DFD Director rejected the decision of the ALJ, *75 holding that "an assistance unit can not receive WFNJ/TANF benefits unless a blood or legal relationship has been established. Because there is no blood or legal relationship between [M.F.] and J.M., . . . the agency acted correctly by denying him WFNJ/TANF benefits for J.M." Accordingly, the DFD Director affirmed the determination of the CCBSS. This appeal followed.
M.F. raises the following arguments for our consideration:
I. APPELLANT IS ENTITLED TO BENEFITS FOR THE CHILD PURSUANT TO NEW JERSEY'S DOCTRINE OF DE FACTO OR PSYCHOLOGICAL PARENTHOOD.
II. BECAUSE APPELLANT AND [J.M.] ARE LEGALLY RELATED BY VIRTUE OF APPELLANT'S STATUS AS A DE FACTO OR PSYCHOLOGICAL PARENT PURSUANT TO NEW JERSEY LAW, THEY CONSTITUTE AN ASSISTANCE UNIT UNDER N.J.S.A. 44:10-34 AND, THEREFORE, ARE ENTITLED TO ASSISTANCE UNDER THE WFNJ STATUTE.
III. THE STATE[']S REGULATORY INTERPRETATION OF THE STATUTE IS CONTRARY TO THE EXPRESS PURPOSE OF THE ENABLING STATUTE.
IV. THE POSSIBILITY THAT APPELLANT MAY BE ELIGIBLE FOR BENEFITS AS A KINSHIP GUARDIAN DOES NOT MEAN THAT HE CANNOT BE ELIGIBLE FOR WFNJ/TANJ BENEFITS AS THE CHILD'S DE FACTO OR PSYCHOLOGICAL PARENT.
In response to our request for additional briefing, M.F. also makes the following arguments:
I.J.M. IS ENTITLED TO BENEFITS AS A "DEPENDENT CHILD ONLY" PURSUANT TO N.J.S.A. 44:10-34 REGARDLESS OF THE STATUS OF ANY ADULTS WHO MAY BE LIVING WITH HIM AND REGARDLESS OF RESPONDENT'S INTERPRETATION OF THE APPLICABLE ENABLING REGULATIONS.
II. IN THE ALTERNATIVE, J.M. IS ENTITLED TO TANF BENEFITS BASED ON APPELLANT'S STATUS AS A NON-NEEDY CARETAKER PURSUANT TO N.J.[A.C.] 10:90-2.7(a)[(3)(i)](2).
III. EVEN IF THE RELEVANT STATUTE (N.J.S.A. 44:10-34) COULD BE DEEMED TO BE AMBIGUOUS IN ITS MEANING OR PURPOSE, IT MUST BE INTERPRETED IN APPELLANT'S FAVOR, SINCE TO DO OTHERWISE WOULD BE INCONSISTENT WITH THE OVERARCHING LEGISLATIVE PURPOSE OF THE WFNJ STATUTORY SCHEME.

II.
Eleven years ago, the United States Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the PRWOR Act). Pub.L. No. 104-193, 100 Stat. 2105. The PRWOR Act abolished the program for Aid to Families with Dependent Children and replaced it with a block-grant funding program designated as TANF. The purpose of the program "is to increase the flexibility of States in operating a program designed *76 to . . . provide assistance to needy families so that children may be cared for in their own homes or in the homes of relatives." 42 U.S.C.A. § 601(a). The Federal TANF regulations, 45 C.F.R. §§ 260.10 to 260.40 (2007), do not define "family" due to the strict limitations on federal regulatory power imposed by the PRWOR Act. 42 U.S.C.A. § 617. The PRWOR Act, thus, leaves the definition of "family" to the states.
The following year New Jersey adopted the Work First New Jersey Act (the WFNJ Act). L. 1997, c. 38[3] (codified as amended at N.J.S.A. 44:10-55 to-78). The Legislature found that the PRWOR Act "establishes the federal block grant for temporary assistance for needy families and provides the opportunity for a state to establish and design its own welfare program." N.J.S.A. 44:10-56(a). It also found that "[w]ork and the earning of income promote the best interests of families and children [and] [w]orking individuals and families needing temporary assistance should have the transitional support necessary to obtain and keep a job in order to be able to avoid cycling back onto public assistance." N.J.S.A. 44:10-56(b), (c). The Legislature declared, in part, that:
The Work First New Jersey program established pursuant to this act incorporates and builds upon the fundamental concepts of the Family Development Initiative established pursuant to P.L. 1991, c. 523 (C.44:10-19 et seq.) in a manner that is consistent with the federal program of temporary assistance for needy families, by establishing requirements for: time limits on cash assistance; the participation of recipients in work activities; enhanced efforts to establish paternity and establish and enforce child support obligations. . . .
[N.J.S.A. 44:10-56(h).]
The WFNJ Act defined the term "assistance unit" to mean "a single person without dependent children; a couple without dependent children; dependent children only; or a person or couple with one or more dependent children who are legally or blood-related, or who is their legal guardian, and who live together as a household unit." N.J.S.A. 44:10-57. Thus, to be considered a family for WFNJ/TANF purposes, the family must meet the criteria for an eligible assistance unit. "Benefits" were defined to mean "any assistance provided to needy persons and their dependent children and needy single persons and couples without dependent children under the Work First New Jersey program." Ibid. The term "dependent child" was defined as follows:
"Dependent child" means a child:
a. under the age of 18;
b. under the age of 19 and a full-time student in a secondary school or an equivalent level of vocational or technical training, if, before the student attains age 19, the student may reasonably be expected to complete the student's program of secondary school or training; or
c. under the age of 21 and enrolled in a special education program,
who is living in New Jersey with the child's natural or adoptive parent or legal guardian, or with a relative designated by the commissioner in a place of residence maintained by the relative as the relative's home.
[N.J.S.A. 44:10-57.]
The Legislature also defined the term "legal guardian" as "a person who exercises continuing control over the person or property, or both, of a child, including any specific right of control over an aspect of *77 the child's upbringing, pursuant to a court order." Ibid. (emphasis added).
The WFNJ program replaced the Aid to Families with Dependent Children Act, N.J.S.A. 44:10-1 to-5 (repealed 1997), and other programs, including the Family Development Initiative, N.J.S.A. 44:10-19 to-33 (repealed 1997). N.J.S.A. 44:10-58(b). The Legislature required the DHS Commissioner to "take such actions as are necessary to implement and operate the program in accordance with the provisions of the federal [PRWOR Act]." N.J.S.A. 44:10-58(a). The WFNJ Act placed responsibility for support squarely on adult persons in the family. N.J.S.A. 44:10-59(a). Benefits were declared to be temporary and to "serve the primary goal of fostering self-sufficiency." N.J.S.A. 44:10-59(b). The WFNJ Act provided for cash assistance payments to applicants and required the DHS Commissioner to "establish regulations determining eligibility and other requirements of the Work First New Jersey program." N.J.S.A. 44:10-59(e). More specifically, the WFNJ Act required the Commissioner, "pursuant to the `Administrative Procedure Act,' . . . [to] adopt rules and regulations to effectuate the purposes of this act." N.J.S.A. 44:10-70.
Concomitant with the adoption of the WFNJ Act, the Legislature passed an implementing act concerning the administration of the WFNJ Act, imposing time limits on receipt of benefits, and amending a variety of related acts. L. 1997, c. 37, §§ 1-7, 17[4] (codified as amended at N.J.S.A. 44:10-71 to-78). The terms "assistance unit," "benefits," "dependent child," and "legal guardian" were defined in precisely the same manner as in the WFNJ Act. N.J.S.A. 44:10-71. This act made county agencies "responsible for implementing the [WFNJ] program in accordance with regulations adopted by the commissioner and ensuring that all eligible persons residing in the county have access to benefits." N.J.S.A. 44:10-73(a).
In anticipation of the adoption of the WFNJ Act, the Legislature had earlier adopted two acts concerning welfare reform. L. 1997, c. 13-14[5] (codified as amended at N.J.S.A. 44:10-34 to-54). One of these acts, N.J.S.A. 44:10-34, contained definitions related to work activity, and the other, N.J.S.A. 44:10-44, contained definitions related to eligibility. These definitions mirror the definitions in the subsequently enacted WFNJ Act and its implementing legislation. Compare N.J.S.A. 44:10-34 and N.J.S.A. 44:10-44 with N.J.S.A. 44:10-57 and N.J.S.A. 44:10-71. Both acts required the Commissioner to adopt rules and regulations pursuant to the Administrative Procedure Act to effectuate the purposes of both acts. N.J.S.A. 44:10-43; N.J.S.A. 44:10-54.

III.
Consistent with these statutory mandates, the DHS Commissioner adopted rules and regulations applicable to the WFNJ program. N.J.A.C. 10:90-1.1 to-18.9. The DHS regulation respecting eligibility requires a blood or legal relationship between the child and the person with whom the child lives:
(a) Composition of the eligible WFNJ/TANF assistance unit is as follows:
1. An eligible assistance unit under WFNJ/TANF shall be comprised of those individuals who are living together and functioning as one economic unit *78 and whose relationship is based upon a blood and/or legal relationship. (A legal relationship is one that is created through marriage, adoption or legal guardianship procedures.) The eligible WFNJ/TANF assistance unit includes the parent(s), parent person(s) or legal guardian . . . and his or her children up to the age of 18. . . .
. . . .
3. The term "parent" shall refer to natural and/or adoptive parent(s), parent-person(s) or legal guardian(s). By law, certain relatives shall be recognized as taking the place of a parent.
i. The term "parent-person" refers to any person related by blood, marriage or adoption.
(1) An applicant who is a parent-person may apply for WFNJ/TANF benefits for a child(ren) and him or herself as a needy parent-person.
(2) Non-needy caretakers and/or parent persons shall also be eligible to apply for WFNJ/TANF benefits for the children in their care.
. . . .
iv. A legal guardian, according to N.J.S.A. 9:3-38, refers to a person who has "the right to exercise continuing control over the person or property or both of a child which includes any specific right of control over an aspect of the child's upbringing, pursuant to a court order."
[N.J.A.C. 10:90-2.7.]
M.F. contends that the regulations promulgated by the Commissioner are contrary to the express purpose of the WFNJ/TANF program because "[a] significant number of the state's children are without a parent or blood relative who is willing or able to care for them." He urges that, like J.M., other adults voluntarily care for these children and "assume the responsibilities of the child's absent parents." M.F. argues that the regulations "critically restrict[] the availability of TANF assistance for many of these children and their caregivers by narrowing, without legal justification, the meaning of the term `legally related.'" Finally, M.F. contends that the Legislative findings regarding the importance of establishing and maintaining "successful family life and childhood development," N.J.S.A. 44:10-56(f), require a broad interpretation of the term "legally related."
Appellate review of challenges to an administrative agency's rulemaking function is limited. "Administrative regulations are accorded a presumption of validity." N.J. State League of Municipalities v. Dep't of Cmty. Affairs, 158 N.J. 211, 222, 729 A.2d 21 (1999) (League of Municipalities). Moreover, "[t]he party challenging their validity bears the burden of proving that the regulations are arbitrary, capricious or unreasonable." Ibid.; see also In re Amendment of N.J.A.C. 8:31B-3.31, 119 N.J. 531, 543-44, 575 A.2d 481 (1990); N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561, 384 A.2d 795 (1978) (Hearing Aid Dispensers). "That judicial deference to administrative agencies stems from the recognition that agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are `particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues that . . . rulemaking would invite.'" League of Municipalities, supra, 158 N.J. at 222, 729 A.2d 21 (quoting Bergen Pines County Hosp. v. N.J. Dep't of Human Servs., 96 N.J. 456, 474, 476 A.2d 784 (1984)). Accordingly, we cannot substitute our judgment for that of the agency. Ibid. (citing Dougherty v. Dep't of Human Servs., 91 N.J. 1, 6, 449 A.2d 1235 (1982)).
*79 However, a regulation "`must be within the fair contemplation of the delegation of the enabling statute.'" League of Municipalities, supra, 158 N.J. at 222, 729 A.2d 21 (quoting Hearing Aid Dispensers, supra, 75 N.J. at 561-62, 384 A.2d 795). Additionally, "the absence of an express statutory authorization in the enabling legislation will not preclude administrative agency action where, by reasonable implication, that action can be said to promote or advance the policies and findings that served as the driving force for the enactment of the legislation." A.A. Mastrangelo, Inc. v. Comm'r, Dep't of Envtl. Prot., 90 N.J. 666, 683-84, 449 A.2d 516 (1982). "[T]he reviewing court may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives." Hearing Aid Dispensers, supra, 75 N.J. at 562, 384 A.2d 795.
In defining the term "legal guardian" in N.J.A.C. 10:90-2.7(a)(3)(iv), the DHS Commissioner resorted to the definition of "guardianship" found in our adoption laws at N.J.S.A. 9:3-38(d).[6] However, the WFNJ Act itself defines "legal guardian" as "a person who exercises continuing control over the person or property, or both, of a child, including any specific right of control over an aspect of the child's upbringing, pursuant to a court order." N.J.S.A. 44:10-57 (emphasis added). The regulatory definition, "a person who has `the right to exercise continuing control over the person or property or both of a child which includes any specific right of control over an aspect of the child's upbringing, pursuant to a court order,'" N.J.A.C. 10:90-2.7(a)(3)(iv) (emphasis added), is virtually identical to the definition in the WFNJ Act. The regulatory definition of "legal guardian" in a manner identical to the WFNJ Act is, beyond peradventure, "within the fair contemplation of the delegation of the enabling statute." League of Municipalities, supra, 158 N.J. at 222, 729 A.2d 21 (citation and quotations omitted).
We recognize that we may "examin[e] the entire statute in light of its surroundings and objectives" to determine whether the regulations give effect to the "statutory policy sought to be achieved." Hearing Aid Dispensers, supra, 75 N.J. at 562, 384 A.2d 795. However, we are not persuaded that the policy sought to be achieved by the WFNJ Act is inconsistent with the regulations. It is true that the Legislature was concerned with the importance of establishing and maintaining "successful family life and childhood development." N.J.S.A. 44:10-56(f). That policy, however, does not require a broad interpretation of the term "legally related."
At the time the WFNJ legislation was adopted, the laws concerning the creation of legal relationships between children and persons other than their biological parents, such as by adoption, N.J.S.A. 9:3-37 to-56, required a court proceeding. N.J.S.A. 9:3-42. Furthermore, after the WFNJ Act was signed into law, the Legislature created "kinship legal guardianships," N.J.S.A. 3B:12A-1 to-7,[7] as a vehicle to establish a "legal relationship" in situations where adoption was not feasible. N.J.S.A. 3B:12A-1(b). The Legislature intended such guardian-ships to be "an alternative, permanent legal arrangement for children and their caregivers." Ibid. A *80 caregiver who has been providing care for a child in a kinship relationship for twelve months may petition the court for a kinship legal guardianship. N.J.S.A. 3B:12A-2, -5. The Legislature provided a kinship relationship may exist between a child and a "family friend" where the latter is "a person who is connected to a child or the child's parent by an established positive psychological or emotional relationship that is not a biological or legal relationship." N.J.S.A. 3B:12A-2. Thus, the Legislature incorporated the concept of "psychological parent" recognized two years earlier by the Supreme Court in V.C., supra, 163 N.J. at 230, 748 A.2d 539.
The State's children who are not living with their natural or adoptive parents are eligible for monthly cash subsidies under the Kinship Care Subsidy Program once the kinship legal guardianship has been established. N.J.A.C. 10:90-19.1(a), (c). The subsidies are determined using WFNJ/TANF analyses. N.J.A.C. 10:90-19.5. Thus, this subsidy program is complementary to and consistent with the WFNJ/TANF legislation.
Giving "legal guardian" the broad interpretation urged by M.F. would undermine the child-protective benefits of adoption and kinship legal guardianship. As to the latter, in order to ensure the welfare of children who are not in the care of a parent, the Legislature has required that a petition for kinship legal guardianship include a "kinship caregiver assessment." N.J.S.A. 3B:12A-5(b). Such an assessment must contain:
(1) the full name and address of the person seeking to become the kinship legal guardian;
(2) the circumstances of the kinship relationship;
(3) the whereabouts of the child's parents, if known;
(4) the nature of the parents' incapacitation, if known;
(5) the wishes of the parents, if known;
(6) the ability of the kinship caregiver family to assume permanent care of the child;
(7) the child's property and assets, if known;
(8) the wishes of the child, if appropriate;
(9) any current involvement of a child with the division if the child has an open division case and is actively receiving services;
(10) certification from the caregiver that the caregiver has been providing care and support for the child, while the child has been residing in the caregiver's home, for at least the last 12 consecutive months;
(11) the results from a criminal history record background check and a domestic violence central registry check of the caregiver and any adult residing in the caregiver's household conducted pursuant to [N.J.S.A. 30:4C-86];
(12) the results from a child abuse record check arranged for and coordinated by the division pursuant to [N.J.S.A. 30:4C-86]; and
(13) the results of the caregiver's home review.
[Ibid.]
These requirements are obviously designed to ensure the welfare of children who are not in the care of their natural or adoptive parents. In light of this statutory enactment and the Kinship Care Subsidy Program, N.J.A.C. 10:90-19.1(a), (c),-19.5, which provides benefits similar to TANF, we cannot say that the definition of "legal guardian" in N.J.A.C. 10:90-2.7 is "arbitrary, capricious or unreasonable." League of Municipalities, supra, 158 N.J. at 222, 729 A.2d 21. To the contrary, we *81 find that the definition reflects the Legislature's concern that persons, other than natural and adoptive parents, who receive financial subsidies for children be persons whom the child welfare system has investigated and found to be appropriate guardians.
We are also not persuaded that a broader definition of "legal relationship" is mandated by our Supreme Court's decision in V.C., supra, 163 N.J. at 230, 748 A.2d 539, as urged by M.F. There, the Court was "called on to determine what legal standard applies to a third party's claim to joint custody and visitation of her former domestic partner's biological children, with whom she lived in a familial setting and in respect of whom she claims to have functioned as a psychological parent." Id. at 205, 748 A.2d 539. V.C. and M.J.B. were a lesbian couple and both cared for the twin children born to M.J.B. Id. at 206-07, 748 A.2d 539. At trial they testified to the various duties and responsibilities each assumed and to the affectionate relationship of both with the children. Id. at 207-09, 748 A.2d 539. Psychological experts at trial opined that there was a bonded relationship between the children and V.C., although their opinions differed regarding the effect of the termination of the relationship with V.C. Id. at 211-12, 748 A.2d 539. The trial court denied V.C.'s application for joint custody and visitation, but we reversed the denial of visitation while affirming the denial of joint custody. Id. at 212-13, 748 A.2d 539.
Our Supreme Court recognized the line of cases finding psychological or de facto parent status and concluded that they were based on "a recognition that children have a strong interest in maintaining the ties that connect them to adults who love and provide for them. That interest, for constitutional as well as social purposes, lies in the emotional bonds that develop between family members as a result of shared daily life." Id. at 221, 748 A.2d 539. After finding that V.C. had standing to seek joint custody and visitation, the Court turned its attention to the manner in which a litigant "may establish that he or she has, in fact, become a psychological parent to the child of a fit and involved legal parent." Id. at 222, 748 A.2d 539. The Court concluded that
the legal parent must consent to and foster the relationship between the third party and the child; the third party must have lived with the child; the third party must perform parental functions for the child to a significant degree; and most important, a parent-child bond must be forged. We are satisfied that that test provides a good framework for determining psychological parenthood in cases where the third party has lived for a substantial period with the legal parent and her child.
[Id. at 223, 748 A.2d 539.]
The Court analyzed the proofs required for each of the above prongs, id. at 223-27, 748 A.2d 539, and concluded that "[t]he standards to which we have referred will govern all cases in which a third party asserts psychological parent status as a basis for a custody or visitation action regarding the child of a legal parent, with whom the third party has lived in a familial setting." Id. at 227, 748 A.2d 539. Finally, the Court noted that "[e]stablishing psychological parenthood is not an easy task and the standards we have adopted should be scrupulously applied in order to protect the legal parent-child relationship." Id. at 230, 748 A.2d 539. Nothing in the case suggests, however, that psychological parenthood would create a legal relationship with a child, such as a right to joint custody or visitation, without a court order.[8]
*82 Although the principles enunciated in V.C. might, on adequate proofs,[9] permit a conclusion that M.F. is a psychological parent to J.M., we conclude that the case is not on point here. The WFNJ/TANF legislation and regulations would not permit the CCBSS or the DFD to award benefits based on psychological parenthood because both the WFNJ Act and the regulations require third-party parental status to be established "pursuant to a court order."[10]N.J.S.A. 44:10-57; N.J.A.C. 10:90-2.7. As a consequence, we conclude that V.C. does not mandate agency recognition of psychological or de facto parenthood absent a court order determining such status.

IV.
M.F. next contends that the CCBSS and the DFD erred in denying WFNJ/TANF benefits for J.M. because N.J.S.A. 44:10-34 provides that an assistance unit may be comprised of "dependent children only." As such, he argues that benefits to a dependent child only are payable "without regard to whether the child is living with an adult who may also qualify for benefits."
We begin our consideration of this argument by restating applicable legal principles. The judicial role in reviewing decisions of administrative agencies is restricted to the following four inquires:
(1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
[George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 27, 644 A.2d 76 (1994).]
Accordingly, "[o]ur function is to determine whether the administrative action was arbitrary, capricious or unreasonable." Burris v. Police Dep't, W. Orange, 338 N.J.Super. 493, 496, 769 A.2d 1112 (App.Div.2001) (citing Henry v. Rahway State Prison, 81 N.J. 571, 580, 410 A.2d 686 (1980)). The precise issue is whether the findings of the agency could have been reached on the credible evidence in the record, considering the proofs as a whole. Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965). However, although we must give deference to an administrative agency charged with interpretation of the law, we are not bound by the agency's legal opinions. Levine v. State, Dep't of Transp., 338 N.J.Super. 28, 32, 768 A.2d 192 (App.Div.2001) (citing G.S. v. Dep't of Human Servs., Div. of Youth & Family Servs., 157 N.J. 161, 170, 723 A.2d 612 (1999)); see also Mayflower Secs. Co. v. *83 Bureau of Secs., 64 N.J. 85, 93, 312 A.2d 497 (1973).
The statute in question provides:
"Assistance unit" means: a single person without dependent children; a couple without dependent children; dependent children only; or a person or couple with one or more dependent children who are legally or blood-related, or who is their legal guardian, and who live together as a household unit.
[N.J.S.A. 44:10-57.]
The statute goes on to define the term "dependent child" in the following manner:
"Dependent child" means a child:
a. under the age of 18;
b. under the age of 19 and a full-time student in a secondary school or an equivalent level of vocational or technical training, if, before the student attains age 19, the student may reasonably be expected to complete the student's program of secondary school or training; or
c. under the age of 21 and enrolled in a special education program,
who is living in New Jersey with the child's natural or adoptive parent or legal guardian, or with a relative designated by the commissioner in a place of residence maintained by the relative as the relative's home.
[Ibid.]
Clearly, J.M. is not a "dependent child" because he is not residing with a "legal guardian," i.e., "a person who exercises continuing control over the person or property, or both, of a child, including any specific right of control over an aspect of the child's upbringing, pursuant to a court order." Ibid.
Nonetheless, M.F. contends that only children under the age of twenty-one who are enrolled in a special education program must live "in New Jersey with the child's natural or adoptive parent or legal guardian." He bases this argument on a misprint in the codification of L. 1997, c. 13, § 1; L. 1997, c. 14, § 1; and L. 1997, c. 38, § 3. In N.J.S.A. 44:10-34,-44 and-57, West Publishing Co. failed to separate the ending qualification from subsection (c) with a paragraph break,[11] although it did include such a paragraph break in N.J.S.A. 44:10-71.[12] We are satisfied from our reading of the original text of the pertinent statutes that in all four acts the Legislature had a paragraph break after the words "under the age of 21 and enrolled in a special education program," and before "who is living in New Jersey with the child's natural or adoptive parent or legal guardian." However, even if the Legislature had not begun the ending qualification as a new paragraph, we would nonetheless conclude that it modified all three categories of "dependent child."
"Where a comma is used to set a modifying phrase off from previous phrases, the modifying phrase applies to all the previous phrases, not just the immediately preceding phrase." Gudgeon v. County of Ocean, 135 N.J.Super. 13, 17, 342 A.2d 553 (App.Div.1975) (commenting in n. 1 thereto that "[t]his is the converse of the general rule that qualifying words refer solely to the immediately preceding word.")

*84 "[A] rule of grammatical construction . . . dictates that separation of a qualifying phrase from antecedents by a comma evidences an intent that the phrase apply to all antecedents, instead of solely to the immediately preceding one. [When] the Legislature intend[s] the qualifying clause to modify all the antecedents . . ., a comma [is] inserted. . . . "
[In re Dep't of Cmty. Affairs Order of March 15, 1988, 232 N.J.Super. 136, 141-42, 556 A.2d 807 (App.Div.1989) (citations omitted).]
See also N.J. Bank v. Palladino, 77 N.J. 33, 45, 389 A.2d 454 (1978); T.I. McCormack Trucking Co. v. United States, 251 F.Supp. 526, 533 (D.N.J.1966) ("[I]f [a] modifier is intended to relate to more than the `last antecedent', a comma is used to set off the modifier from the entire series.").
We are, thus, persuaded that the ending qualification modifies all three subsections of the definition of "dependent child" because the four enactments not only separate the ending qualification as a new paragraph below subsection (c) in all four acts, but precede it by a comma. See L. 1997, c. 13, § 1; L. 1997, c. 14, § 1; L. 1997, c. 37, § 1; L. 1997, c. 38, § 3. This conclusion is consistent with the statutory scheme. The interpretation urged by M.F. would make TANF benefits available to any minor living with an adult even though there was no putative family relationship, such as a minor living with a friend over the age of eighteen. This is patently inconsistent with the legislative purpose to provide temporary assistance to needy families. As a consequence, we conclude that the CCBSS and the DFD did not act in an arbitrary, capricious or unreasonable manner in denying benefits because J.M. does not qualify for WFNJ/TANF benefits under the "dependent child only" category of an assistance unit.

V.
M.F. also contends the WFNJ/TANF benefits are payable to him as a non-needy caretaker pursuant to N.J.A.C. 10:90-2.7(a)(3)(i)(2). A "`[n]on-needy caretaker' means a relative caring for a dependent child, or a legal guardian of a minor child who, in the absence of a natural or adoptive parent, assumes parental responsibility for such minor child." N.J.A.C. 10:90-15.1. We have already discussed the definition of "dependent child" and do not repeat that discussion here. As to whether M.F. is "a legal guardian of a minor child," N.J.A.C. 10:90-15.1 provides that a "`[l]egal guardian' means a person who exercises continuing control over the person or property, or both, of a child, including any specific right of control over an aspect of the child's upbringing, pursuant to a court order" (emphasis added). Here, again, J.M. is not a "dependent child" and M.F., in the absence of a court order, is not a "legal guardian." The WFNJ/TANF benefits payable to M.F. were properly reduced by the CCBSS and the final administrative agency action of the DFD was correct. As a consequence, we do not find the denial of WFNJ/TANF benefits for J.M. to have been arbitrary, capricious or unreasonable.

VI.
Lastly, M.F. argues that "[a] significant number of the state's children are without a parent or blood relative who is willing or able to care for them." He contends that, like J.M., other adults voluntarily care for these children and "assume the responsibilities of the child's absent parents." M.F. argues that the availability of TANF assistance for many of these children and their caregivers has been "critically restrict[ed] . . . by narrowing, without legal justification, the meaning of the term `legally *85 related.'" He urges that the Legislative findings regarding the importance of establishing and maintaining "successful family life and childhood development," N.J.S.A. 44:10-56(f), are inconsistent with the definition of the term "legally related."[13]
"Generally, the wisdom, prudence and good sense of the Legislature in the enactment of law are not questions for the judiciary to resolve." Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J.Super. 52, 57, 766 A.2d 312 (App.Div.2001) (citing Burton v. Sills, 53 N.J. 86, 95, 248 A.2d 521 (1968), appeal dismissed, 394 U.S. 812, 89 S.Ct. 1486, 22 L.Ed.2d 748 (1969)); see also Burt v. W. Jersey Health Sys., 339 N.J.Super. 296, 309, 771 A.2d 683 (App.Div.2001). The Legislature has clearly and unequivocally required the existence of a court order establishing a legal relationship and we may not depart from that requirement.
Affirmed.
NOTES
[1] See generally N.J.S.A. 44:10-34 to-78.
[2] D.M. identified three putative fathers to CCBSS. M.F. contends that D.M. told him that one of these three was the actual father and that he had died.
[3] Pamphlet law, Chapter 38, http://www. njleg.state.nj.us/9697/Bills/PL97/38_.PDF.
[4] Pamphlet law, Chapter 37, http://www. njleg.state.nj.us/9697/Bills/PL97/37_.PDF.
[5] Pamphlet law, Chapter 13, http://www. njleg.state.nj.us/9697/ Bills/PL97/13_.PDF and Pamphlet law, Chapter 14, http://www. njleg. state.nj.us/9697/Bills/PL97/14_.PDF.
[6] "`Guardianship' means the right to exercise continuing control over the person or property or both of a child which includes any specific right of control over an aspect of the child's upbringing derived from court order."
[7] M.F. did file an application for kinship legal guardianship after WFNJ/TANF benefits were denied, but failed to prosecute his application while this appeal was pending.
[8] Indeed, the statute providing for kinship legal guardianship recognizes "an established positive psychological or emotional relationship" with the child as a basis for declaring a kinship legal guardianship. N.J.S.A. 3B:12A-2.
[9] There were no stipulated facts before the ALJ that would permit him to conclude that M.F. "perform[ed] parental functions for the child to a significant degree; and most important, a parent-child bond [was] forged." V.C., supra, 163 N.J. at 223, 748 A.2d 539. Additionally, unlike V.C., there was no expert opinion offered establishing a psychological bond between M.F. and J.M.
[10] Furthermore, we note that no effort has apparently been made to determine the identity of J.M.'s biological father in that D.M. identified three putative fathers, and, if the biological father is alive, to provide him with notice of M.F.'s application. These important due process interests may not be ignored in determining whether M.F. should have a legal relationship with J.M.
[11] The paragraph breaks in N.J.S.A. 44:10-44 and-57 were preserved in the versions of those statutes published in the LexisNexis® New Jersey Annotated Statutes, but it was deleted in the LexisNexis® version of N.J.S.A. 44:10-34. The correct formatting is reflected in Parts III and IV, supra.
[12] The version of this statute published in the LexisNexis® New Jersey Annotated Statutes also contains the paragraph break.
[13] M.F. also contends that there are significant delays in approving Kinship Legal Guardianship applications. However, he provides no evidence to support that argument.