**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3097-19

W.M.,

      Plaintiff-Appellant.

v.

D.G.,

      Defendant-Respondent.

_____

A.M.B.,

      Intervenor-Respondent.

_____

<div style="border:1px solid black">

**APPROVED FOR PUBLICATION**

**April 14, 2021**

**APPELLATE DIVISION**

</div>

Argued March 3, 2021 – Decided April 14, 2021

Before Judges Ostrer, Accurso and Enright.

On appeal from the Superior Court of New Jersey,
Chancery Division, Family Part, Passaic County,
Docket No. FD-16-0674-20.

Jodi Argentino argued the cause for appellant
(Argentino Fiore Law & Advocacy, LLC, attorneys;
Jodi Argentino, of counsel and on the brief; Celeste
Fiore, on the brief).

D.G., respondent, argued the cause pro se.

Carmen Diaz-Duncan argued the cause for intervenor
A.M.B. (Newsome O'Donnell, LLC, attorneys;

Carmen Diaz-Duncan, of counsel and on the brief; Brian E. Newsome and Edward J. O'Donnell, on the brief).

Scott M. Weingart argued the cause for amici curiae Partners for Women and Justice, Rachel Coalition, Rutgers Domestic Violence Clinic, Seton Hall University Law Center for Social Justice, and Volunteer Lawyers for Justice (McCarter & English, LLP, attorneys; Adam N. Saravay, Michelle Movahed, Scott M. Weingart and Benjamin D. Heller, on the brief).

The opinion of the court was delivered by

ENRIGHT, J.A.D.

In this non-dissolution matter, plaintiff W.M.[1] appeals from the January 29, 2020 and March 11, 2020 orders directing her to return physical custody of intervenor-respondent A.M.B. (Alex) to his biological mother, defendant D.G.[2] We reverse.

By way of brief background, Alex was born in April 2003. In 2017, he was in the eighth grade and a member of the National Honor Society. Plaintiff was his National Honor Society advisor. In anticipation of Alex's middle school graduation, plaintiff offered to assist defendant in completing an

---

[1] We use initials for the parties and a fictitious name for the minor to protect their privacy. R. 1:38-3(d)(13).

[2] Alex's biological father is not a party to this appeal.

application for Alex to attend a particular high school in Newark. Defendant accepted the offer. She testified that after her sister died in March 2017, she was "down and too depressed," so plaintiff started assisting her in caring for Alex, taking him to school and church. According to plaintiff, in or around July 2017, with defendant's consent, Alex began living with plaintiff and her family. The parties lived only a few blocks apart, so Alex spent time with his mother while he lived at plaintiff's home. It is uncontroverted Alex participated in various activities and continued to excel academically after he entered high school.

The informal arrangement between the parties was mutually satisfactory for a significant period of time, and defendant admitted to the trial court that plaintiff "did help a lot." However, defendant occasionally expressed concern that plaintiff was indulging Alex by purchasing expensive items for him, such as an iPhone. Defendant told plaintiff to "stop spoiling" Alex because she could not "compete with that."

Late in November 2019, defendant learned Alex was chosen to appear in a television commercial. Alex came to her home afterwards to show her an expensive jacket he was allowed to keep from his involvement in the commercial. Defendant became angry, believing plaintiff was "buying [her] child," and promptly informed plaintiff that Alex needed to be returned to

defendant's custody. The situation deteriorated when Alex learned of his mother's actions. He confronted her, telling her to leave plaintiff "alone." Alex further informed his mother he did not want to return home.

Plaintiff filed an emergent application in late November 2019, seeking to retain physical custody of Alex. In response, defendant filed her own emergent application for Alex to return to her home. The trial court denied both applications, pending a hearing a few weeks hence, and permitted Alex to continue living with plaintiff until the hearing occurred.

Both parties appeared in court without counsel in mid- December. After each party testified, the judge allowed Alex to remain in plaintiff's care, but continued the hearing to the end of January. The judge directed Alex to be present for that hearing.

The parties and Alex appeared before the court on January 29, 2020. No one was represented by counsel at that proceeding. Defendant was the first witness to testify at the hearing. She initially informed the judge she "never had any agreement giving the custody of [her] child to anybody." However, she knew plaintiff was a teacher in Alex's school in 2017, and when plaintiff offered to help fill out an application for Alex to enroll in a local high school, she accepted plaintiff's help. Defendant also noted plaintiff offered to bring her son to school, raise money for her son to graduate from the eighth grade,

and sent her money that was collected at a local church for defendant's benefit. Defendant described her appreciation for plaintiff's assistance at the time, acknowledging, "I'm kind of blessed. I got this lady helping me. I have this lady helping my child. And I'm trusting her." As plaintiff became more involved in Alex's life, defendant recalled arguing with plaintiff about involving him in too many activities and "giving [him] so many things." Defendant felt plaintiff needed to "calm down." Defendant added, "[s]o far, we fight five times over the same thing."

Plaintiff also testified during the January 29 hearing. She recalled that when Alex was in seventh grade, he had eighty-three absences, a "chronic absentee record." Because Alex was one of her National Honor Society students, plaintiff became aware he did not have money to pay his dues. She thought she could help him so she "became involved." According to plaintiff, defendant embraced her assistance and "never complain[ed], never said it's too much." Regarding Alex's living conditions at his mother's home, plaintiff stated Alex's brother is "bipolar and schizophrenic and he's dangerous." She added that because of the danger his sibling presented to Alex, defendant feared the Division of Child Protection and Permanency (Division) would "take [Alex] away." Therefore, defendant asked plaintiff to write a letter to the Division in October 2017 in which defendant confirmed she was aware Alex

5

was living with plaintiff for his safety and was "in a better condition at [plaintiff's] home . . . than he would be at" defendant's home. According to plaintiff, once the relationship between the two women soured, defendant demanded Alex return home, and "called [her] school twice, telling them that there was a teacher in the fourth grade who was molesting her students . . . . The third time she showed up to the building and . . . security guards did not let her in." Plaintiff asked the judge to continue the status quo and allow Alex to remain in her home.

Alex was the last to testify. He was almost seventeen years old at the time. The judge asked Alex what he had "to say about this matter," and he confirmed he would never have been able to stay at plaintiff's home unless defendant was "okay with it to begin with." Alex added that, at times, defendant encouraged him to "leave the house because of [his] schizophrenic brother." Alex also unequivocally expressed his desire to remain in plaintiff's care. He testified living with his mother was "unhealthy" and "unfit." Additionally, he stated he "never had a relationship with [his mother] ever" and claimed that even when he was living at home, he was "alone . . . more than half the time." He testified, too, that when he was at his mother's home, he did not feel "wanted – because [his] siblings [were] very abusive," and his mother was "very absent." He described his prior existence at defendant's

6

home as "going through the motions over there" and compared it to living at plaintiff's house, where he felt "secure and . . . [had] all the support [he] need[ed]." Alex also testified that despite his mother's allegations, he had no romantic relationship with plaintiff, that such a suggestion was "nasty," and he viewed plaintiff as his "Mom." While on the stand, Alex testified he had "so much to say and it's hard . . . to get it all out."

Before ending the hearing, the judge reviewed a letter from the Division in which it advised the court that Alex was doing well in plaintiff's care and should remain with her. The Division observed Alex had a "current GPA of 4.036 with only one tardy," and was "in all honors classes." Also, the Division reported defendant's home "appears to be inappropriate as she doesn't have appropriate space for the minor." Defendant informed the Division her nephew, who was recently released from jail after a domestic abuse incident, was living in her home. Additionally, defendant advised the Division she rents out rooms in her home, her boyfriend lived with her and she had an active restraining order against Alex's father. The judge noted that according to court records, it appeared the restraining order referenced by defendant was dismissed by another judge in October 2017.

At the conclusion of the January 29 hearing, and notwithstanding Alex's express desire to remain with plaintiff, the judge found "as far as the legal

documentation is concerned . . . [defendant] has custody." Additionally, the judge concluded a May 2017 letter purportedly written by defendant to plaintiff, which allowed plaintiff to act on Alex's behalf, did not alter defendant's status as Alex's custodial parent. When the judge announced Alex was to return to defendant's custody, plaintiff responded Alex "has nowhere to stay there." Defendant replied she recently had rented a five-bedroom apartment where her son would be more comfortable, and she would be moving there on the first of the month. The judge directed the Division to assess defendant's new home prior to the next hearing date on March 11, 2020. The record reflects the assessment was not conducted as defendant decided prior to the March 11 hearing not to move. Further the record shows Alex remained at plaintiff's home between January 29 and March 11, 2020, notwithstanding the judge's ruling to the contrary.

On March 11, 2020, plaintiff appeared with counsel; defendant appeared self-represented. For the benefit of plaintiff's counsel, the judge summarized what had occurred in prior proceedings. The judge highlighted that a May 2017 letter plaintiff claimed she received from defendant authorized her to act on Alex's behalf "to make certain accommodations for the child's school, necessary documentations, and things like that. It does not address any residential custody." Further, the judge stated she understood plaintiff retained

A-3097-19

counsel "at the very end of this litigation," but "these are summary hearings" and "[w]e've been in court three times with regards to this matter. The court is not willing to reopen the matter . . . under this application . . . . We're already 107 days in on this matter. So we're over-goal on . . . these cross-applications." She directed Alex to be returned to defendant's custody immediately.

Newark police officers arrived at plaintiff's home on the night of March 12, 2020, because Alex refused to return to his mother's home. He told the police he did not want to leave plaintiff's home because he was scared and had been assaulted at his mother's home. The officers told him he had no choice but to comply with the court order, and they transported Alex to his mother's home that night.

On March 13, 2020, plaintiff's counsel filed an order to show cause, addressing new causes of action pertaining to the parties' custody dispute and seeking Alex's immediate return to plaintiff's home. Plaintiff also requested to be designated as Alex's psychological parent. Additionally, she asked the court to schedule a plenary hearing to address ongoing custody issues and moved to have an attorney appointed to represent Alex pursuant to Rule 5:8A. Plaintiff's counsel advised the judge that an attorney volunteered to represent

Alex. The court denied plaintiff's request for emergent relief but agreed to hear her application on March 17, 2020.

Defendant did not appear for the March 17 hearing, although plaintiff's counsel represented she served defendant with notice of the emergent filing via email. The trial court attempted to contact defendant by phone but was unable to do so. During the proceeding, plaintiff's counsel informed the court Alex's attorney was "poised and ready" to participate in the hearing, with or without a formal appointment by the court. The judge declined to appoint an attorney for Alex. She stated it was not necessary for him to be represented by counsel "in this FD matter for today's hearing or any hearing going further." The judge added:

> There's no need at this point for him to be represented by separate counsel . . . . [H]e's very intelligent. He's well spoken. I've had the opportunity to observe him. He is a part of this litigation. He is the child at issue, yes. But again, this is an FD case. I've spoken with him. I'm not going to appoint counsel for [Alex] at this point.

Plaintiff's counsel advised the court Alex was removed by the police on March 12, 2020 and returned to his

> birth mother's house where he slept on the sofa full of dust and it aggravated his asthma. He then indicated to pretty much anyone who would listen, that he would not be staying at his birth mother's house and has now not returned home because he feels unsafe, inappropriately cared for, and has asked that [the

> Division] be contacted at pretty much every turn . . . . [T]he minor child has pretty severe asthma. He utilizes a nebulizer . . . . [H]e should not be in environments that are smokey, environments that are dusty.

In response, the judge noted she previously considered plaintiff's position and denied plaintiff's request for emergent relief. The judge explained she understood Alex lived with plaintiff for the past three years but "custody had never changed. And that was the basis of the court's decision at the last hearing." Further, the judge stated she "placed on the record all of the previous proceedings where it was evident that [defendant] was the custodial parent" of Alex. Moreover, the judge found "nothing has changed even now with this new application." She concluded plaintiff "definitely provided outstanding accommodations for the child. She has guided him with his schoolwork. She has been a support to his mother . . . . But there is nothing here that the court could rely on in . . . depriving [defendant] of her constitutional rights to parent her child."

Plaintiff's counsel urged the court to consider plaintiff's position as Alex's psychological parent. The judge responded:

> the court recognizes that exceptional circumstances could very well be argued of the . . . psychological parentage . . . . But, again, the court also has to find clear and convincing evidence of what I've just placed on the record. Parental abandonment, unfitness or gross misconduct . . . . The court has to look also to

11

> [defendant's] rights as a parent and whether they should be terminated.

Although the judge denied plaintiff's emergent application for custody, she agreed to consider plaintiff's remaining requests for relief on April 16, 2020. Additionally, the judge denied plaintiff's application for a stay pending appeal.

Plaintiff immediately sought emergent appellate relief, and on March 17, 2020, we stayed the trial court's orders of March 11, 13 and 17, 2020. We also directed physical custody of Alex to be returned to plaintiff pending further order. On April 6, 2020, we continued the stay pending appeal and granted Alex's attorney permission to act as the minor's law guardian.

On appeal, plaintiff argues the trial court failed to hold a proper plenary hearing to address Alex's best interests, misapplied the law relating to psychological parentage, prematurely concluded the proceedings due to the time spent in prior hearings, and mistakenly denied Alex the right to counsel. As intervenor, Alex's law guardian contends the judge erred in denying Alex counsel and failing to appoint her firm to act as Alex's law guardian. She also argues the trial court improperly conducted proceedings in Alex's absence.

Amici curiae decline to take a position on whether the trial court erred in returning Alex to his mother's physical custody. Instead, they present broader arguments involving constitutional due process protections for FD litigants and

A-3097-19

contend additional procedural protections are needed for litigants involved in FD child custody disputes. Amici specifically argue custody disputes should not be resolved in summary fashion and trial courts should ensure children's opinions are heard in FD child custody cases.

As a threshold matter, we recognize Alex is almost eighteen. However, we do not deem all issues raised in this appeal as moot. See Greenfield v. N.J. Dep't of Corr., 382 N.J. Super. 254, 257-58 (App. Div. 2006) ("An issue is moot when the decision sought in a matter, when rendered, can have no practical effect on the existing controversy."). Instead, we are persuaded certain issues in this case may be capable of repetition and should be addressed. See Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 330 (1996) (stating that courts may consider an otherwise moot issue if it is likely to reoccur but evade review).

Appellate review of a trial court's findings in a custody dispute is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 411-12 (citing Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974)). Furthermore, appellate courts afford substantial deference to the Family Part's findings of fact because of that court's special expertise in family matters. Id. at 413. "Deference is

especially appropriate when the evidence is largely testimonial and involves questions of credibility because, having heard the case, and seen and observed the witnesses, the trial court has a better perspective than a reviewing court in evaluating the veracity of witnesses." P.B. v. T.H., 370 N.J. Super. 586, 601 (App. Div. 2004) (citing Pascale v. Pascale, 113 N.J. 20, 33 (1988)). However, appellate courts review issues of law de novo, even those that arise in the context of a custody dispute. R.K. v. F.K., 437 N.J. Super. 58, 61 (App. Div. 2014).

The United States Constitution, New Jersey's statutes and Constitution, and common sense "afford a fit parent a superior right to the custody of his or her child as against third parties." Watkins v. Nelson, 163 N.J. 235, 245 (2000); see also New Jersey Div. of Youth and Family Services v. R.G., 217 N.J. 527, 553 (2014). Thus, "a presumption of custody exists in favor of the parent." Watkins, 163 N.J. at 246. Both parents have an equal right to custody of their child. N.J.S.A. 9:2-4.

Unlike a child's legal parents, third parties, such as grandparents, who have a close relationship with a child, have no inherent rights to custody of that child. See Watkins, 163 N.J. at 245. Likewise, a grandparent or other third party granted custody via court order does not bestow parental rights

upon that third party. Tortorice v. Vanartsdalen, 422 N.J. Super. 242, 251-52 (App. Div. 2011).

Yet, "[t]he right of parents to the care and custody of their children is not absolute." V.C. v. M.J.B., 163 N.J. 200, 218 (2000). While there is a presumption supporting a natural parent's "right to the care, custody, and control of his or her child," this "presumption in favor of the parent will be overcome by 'a showing of gross misconduct, unfitness, neglect, or "exceptional circumstances" affecting the welfare of the child[.]'" K.A.F. v. D.L.M., 437 N.J. Super. 123, 131-32 (App. Div. 2014) (quoting Watkins, 163 N.J. at 246). An exceptional circumstance that overrides the presumption favoring the natural parent occurs when a third party has become a child's "psychological parent," i.e., where "a third party has stepped in to assume the role of the legal parent who has been unable or unwilling to undertake the obligations of parenthood." V.C., 163 N.J. at 219 (citing Sorentino v. Fam. & Child.'s Soc. of Elizabeth, 72 N.J. 127, 132 (1976)). The exceptional circumstances element is grounded in the court's power of parens patriae to protect minor children from serious physical or psychological harm. Watkins, 163 N.J. at 246-47.

To be recognized as a psychological parent, a third party must file a petition with the court. Lewis v. Harris, 188 N.J. 415, 450 n. 20 (2006). If on

15                                                                      A-3097-19

reviewing such petition, the court determines a third party is a child's psychological parent, "he or she stands in parity with the legal parent." V.C., 163 N.J. at 227 (citing Zack v. Fiebert, 235 N.J. Super. 424, 432 (App. Div. 1989)). On the other hand, a mere court-ordered award of custody to a third party does not elevate that third party to the status of a custodial parent, nor does it terminate an existing parent-child relationship. Tortorice, 422 N.J. Super. at 251. Further, a custody award does not entitle the third party to enter the constitutionally protected zone of autonomous privacy that is fundamental to the legal parent-child relationship. Tortorice, 422 N.J. Super. at 251-52.

A third party establishing exceptional circumstances by proving psychological parentage "may rebut the presumption in favor of a parent seeking custody even if he or she is deemed to be a fit parent." Watkins, 163 N.J. at 247-48. "In such circumstances, the legal parent has created a family with the third party and the child[,] . . . essentially giving [the child] another parent[.]" V.C., 163 N.J. at 227. If a third party is deemed a child's psychological parent, thereby standing "in parity with the legal parent," "[c]ustody and visitation issues between them are to be determined on a best interests [of the child] standard[.]" V.C., 163 N.J. at 227-28 (citing Zack, 235 N.J. Super. at 432).

16

In <u>V.C.</u>, our Supreme Court set forth the requirements a third party must demonstrate to establish psychological parentage. <u>Id.</u> at 223. The four-prong test to be satisfied is as follows:

> [1] the legal parent must consent to and foster the relationship between the third party and the child; [2] the third party must have lived with the child; [3] the third party must perform parental functions for the child to a significant degree; and [4] most important, a parent-child bond must be forged.
>
> [<u>Ibid</u>.]

In discussing the fourth element, the Court stated, "[w]hat is crucial here is not the amount of time but the nature of the relationship . . . . Generally, that will require expert testimony." <u>Id.</u> at 226-27.

Here, the judge did not undertake a complete examination of the psychological parentage issue, and thus never reached a best interests analysis for Alex's benefit, even though she acknowledged "exceptional circumstances could very well be argued." Additionally, it appears the judge was under the mistaken impression that before she could consider plaintiff's request to be deemed Alex's psychological parent, she first would need to find by "clear and convincing evidence" that Alex's parents struggled with issues of parental abandonment, unfitness or gross misconduct. The judge compounded this error by finding she also had to look to defendant's "rights as a parent and whether they should be terminated." However, as we have discussed, a third

17

party establishing exceptional circumstances by proving psychological parentage "may rebut the presumption in favor of a parent seeking custody even if he or she is deemed to be a fit parent." Watkins, 163 N.J. at 247-48.

Because Alex is due to turn eighteen in a matter of weeks, we perceive no value in remanding this matter to allow the trial court to determine if plaintiff can establish her psychological parentage claim. For similar reasons, we decline to address each argument raised by plaintiff, Alex's law guardian and amici. However, for the benefit of litigants who find themselves navigating the FD docket, we observe that, as with other custody disputes, generally litigants involved in an FD custody dispute should be required to attend mediation before a plenary hearing is conducted. R. 1:40-5 and R. 5:8-1. The record does not indicate that happened here. Of course, litigants and their minor children also remain free to pursue therapeutic options.

Additionally, where custody or parenting time is an issue, a trial court may appoint counsel on behalf of the child. R. 5:8A. The court also has the discretion to appoint a guardian ad litem to represent the child's best interests. R. 5:8B. The application for either appointment can be made by a party or the child, or the court may direct the appointment on its own motion.

Here, Alex testified in open court that he had "so much to say and it's hard . . . to get it all out." During the next hearing, plaintiff's counsel

requested that independent counsel advance Alex's positions. The judge declined this request, finding she had a chance to hear from and observe Alex, and that Alex was intelligent and "well spoken." In light of Alex's age and his statements to the court, along with the fact that Alex's counsel was "poised" to immediately represent him, we are persuaded the totality of circumstances militated in favor of appointing counsel for the minor.

Regarding the summary nature of the proceedings, we recognize the judge afforded both parties an opportunity to be heard on more than one occasion. She also ensured Alex participated in the proceedings. However, it is unclear why the court did not permit cross-examination to test the veracity of the witnesses. Given the nature of the parties' dispute, cross-examination should have been permitted to discern what was in the best interests of the child.

Additionally, we observe that during the March 11, 2020 hearing, the judge declined to "reopen the matter" to more fully address concerns raised by plaintiff's counsel, noting that typically FD matters involve "summary hearings." Further, the judge informed plaintiff's counsel the parties were "in court three times with regards to this matter," and the case had aged to "107 days . . . . So we're over-goal on . . . these cross-applications."

Typically, FD custody disputes are to be handled in summary fashion. R. 5:4-4. "The summary nature of [an FD] action is intended 'to accomplish the salutary purpose of swiftly and effectively disposing of matters which lend themselves to summary treatment . . . ." R.K. v. D.L., 434 N.J. Super. 113, 133 (App. Div. 2014) (quoting Washington Commons, LLC v. City of Jersey City, 416 N.J. Super. 555, 564 (App. Div. 2010), certif. denied, 205 N.J. 318 (2011)). For this reason, "[s]ummary actions in the Family Part are ordinarily tried without the benefits of discovery." Ibid. (citing R. 5:5-1).

However, the summary nature of an FD action is also intended to give '"the defendant an opportunity to be heard at the time [the] plaintiff makes [an] application on the question of whether or not summary disposition is appropriate."' Id. at 133 (quoting Washington Commons, 416 N.J. Super. at 564). A Family Part judge has the authority to order, and parties have a right to request, that a matter be placed on a complex track. R. 5:4-2(j). In fact, as we previously have held, "[t]he need and degree of judicial supervision is left entirely to the discretion of the trial judge" in FD proceedings. R.K., 434 N.J. Super. at 138. Thus, an FD custody dispute, like other FD actions, "should not be automatically treated by the Family Part as a summary action requiring expedited resolution, merely because it bears an FD docket number." Id. at

133. Notably, neither party formally asked the court to place the case on the complex track.

Nevertheless, considering that plaintiff raised a credible claim of psychological parenthood, the minor involved was almost seventeen, his attorney sought to intervene, and defendant was unrepresented, this matter should not have been treated summarily. Placing the matter on a complex track would have alleviated some of the time constraints ordinarily associated with the FD docket, and afforded the court the necessary time to grapple with these difficult issues. Also, if plaintiff and Alex had legal representation, the court might have considered appointing pro bono counsel for defendant.

Finally, we are mindful the parties initially were advised by Essex County personnel that they needed to file their cross-applications in Passaic County. This instruction was based, in part, on the fact Alex's parents previously litigated support and custody issues under an existing FD matter in Passaic County. Nonetheless, because the parties and Alex lived in Essex County, and their issues were not inextricably intertwined with issues raised in the Passaic County case, this case should have been heard in Essex County.

To the extent we have not addressed the remaining arguments of the parties or amici, we are satisfied the issues are either moot or involve policy

A-3097-19

questions that are more appropriate for the Supreme Court Family Practice Committee's consideration.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3097-19